Samantha J. Slark (#10774)
SALT LAKE CITY CORPORATION
P.O. Box 145478
451 South State Street, Room 505A
Salt Lake City, UT 84114-5478
Telephone: (801) 535-7788
Samantha.Slark@slc.gov

*Attorney for Defendants*

---

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| JEFFREY RYANS,<br><br>     Plaintiff,<br><br>   vs.<br><br>SALT LAKE CITY CORPORATION, SALT LAKE CITY POLICE DEPARTMENT, OFFICER NICKOLAS PEARCE; OFFICER KEVIN JEWKES; and JOHN DOES  1-5,<br><br>     Defendants. | **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT**<br><br>Case No. 2:22-cv-00279<br><br>Judge Howard C. Nielson, Jr.<br><br>Magistrate Judge Cecilia M. Romero |

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendants Salt Lake City Corporation, Officer Nickolas Pearce, and Officer Kevin Jewkes (collectively, "Defendants"), by and through counsel of record, hereby file this Motion for Summary Judgment and Memorandum in Support.

## <u>TABLE OF CONTENTS</u>

INTRODUCTION AND STATEMENT OF RELIEF SOUGHT ................................................ 1

BACKGROUND FACTS ................................................................................................................ 2

STATEMENT OF UNDISPUTED MATERIAL FACTS ................................................................ 6

A.    911 Receive a Call from a Terrified Fifteen-Year-Old Girl. .................................... 6

B.    Officers Jewkes and Orgill are Dispatched on the Call. ........................................... 7

C.    Officer Pearce is also Dispatched on the Call. ......................................................... 8

D.    The 765 Justin Kay Court Property. ........................................................................ 10

E.    Officers Arrive on Scene. ........................................................................................ 11

F.    Ryans is Located in the Backyard in an Apparent Attempt to Flee the Scene. ....... 14

G.    Ryans Fails to Follow Repeated Orders to Get on the Ground. .............................. 16

H.    Ryans' Behavior Was Extraordinary. ...................................................................... 23

I.    Salt Lake City Policies and Officer Pearce and K9 Tuco's Certifications and Training. 288

J.    Ryans Pled Guilty to Assault and Violation of Protective Order Charges and Officer Pearce is Exonerated of all Charged. ....................................................................... 29

ARGUMENT .................................................................................................................................. 30

I.    OFFICER PEARCE IS ENTITLED TO QUALIFIED IMMUNITY ON RYANS' EXCESSIVE FORCE CLAIM. ................................................................................... 30

    A.    Ryans Cannot Show Officer Pearce's Use of Force Violated Constitutional Rights. ......................................................................................................... 31

        1.    Severity of the Crime .................................................................................. 33

        2.    It was Objectively Reasonable for Officer Pearce to Believe Ryans Posed a Threat to the Safety of the Officers and Others ..................................... 34

        3.    It was Objectively Reasonable for Officer Pearce to Believe Ryans Attempted to Resist or Evade Arrest. ..................................................... 38

        4.    The Bite did not Extend Longer Than Necessary to Secure Ryans in Handcuffs. ................................................................................................... 40

    B.    Officer Pearce's Use of Force did not Violate Clearly Established Law. ............ 41

II.    OFFICER JEWKES IS ENTITLED TO QUALIFIED IMMUNITY ON RYANS' FAILURE TO INTERVENE CLAIM. ...................................................................... 43

    A.    Ryans Cannot Show a Violation of Constitutional Rights .................................. 43

    B.    Ryans Cannot Show the Right Was Clearly Established. ..................................... 45

III.    SALT LAKE CITY IS ENTITLED TO ENTRY OF JUDGMENT ON RYANS' MONELL CLAIM. ................................................................................. 45

    A.    No Constitutional Violation is Shown. ................................................. 45

    B.    The Elements of Monell Liability are also not Met. ............................. 46

        1.    Ryans Cannot Establish Essential Elements of his Third Claim for Relief. ................................................................................. 47

        2.    Ryans Cannot Establish Essential Elements of his Fourth Claim for Relief. ................................................................................. 50

        3.    Ryans Cannot Establish Essential Elements of his Fifth Claim for Relief. ................................................................................. 51

IV.    DEFENDANTS ARE ENTITLED TO ENTRY OF JUDGMENT ON RYANS' STATE CONSTITUTIONAL CLAIMS. ................................................. 52

    A.    Article I, Sections 6 and 25 are not Self-Executing. ............................. 52

    B.    Ryans Cannot Show a Flagrant Violation of Constitutional Rights. .................... 53

    C.    The State Constitutional Claims are Duplicative of Ryans' Federal Claim. ........ 54

CONCLUSION ..................................................................................... 55

## <u>TABLE OF AUTHORITIES</u>

### Cases

Andersen v. DelCore, 79 F.4th 1153 (10th Cir. 2023) ................................................ 33

Anderson v. Creighton, 483 U.S. 635 (1987) ......................................................... 41

Ashcroft v. al-Kidd, 563 U.S. 731 (2011) ............................................................. 41

Blackmore v. Carlson,
   No. 4:21-CV-00026-DN-PK, 2024 WL 2883010 (D. Utah June 7, 2024) ........................ 54, 55

Brown v. Gray, 227 F.3d 1278 (10th Cir. 2000) ...................................................... 48

Brown v. Larsen, 2014 WL 3573415 (D. Utah July 21, 2014) .......................................... 53

Brown v. Whitman, 651 F. Supp. 2d 1216 (D. Colo. 2009) ............................................. 48

Bryson v. City of Oklahoma City, 627 F.3d 784 (10th Cir. 2010) ................................... 50, 51

Cavanaugh v. Woods Cross City, No. 1:08-CV-32-TC-BCW, 2009 WL 4981591 (D. Utah Dec.
   14, 2009), aff'd, 625 F.3d 661 (10th Cir. 2010) ................................................. 54

City of Los Angeles v. Heller, 475 U.S. 796 (1986) .................................................. 45

City of St. Louis v. Praprotnik, 485 U.S. 112 (1988) ................................................ 51

Connick v. Thompson, 563 U.S. 51 (2011) .......................................................... 47, 49

Couser v. Somers, No. 23-3041, 2024 WL 1006794 (10th Cir. Mar. 8, 2024) ........................... 32

Crall v. Wilson, 769 Fed. Appx. 573 (10th Cir. 2019) ................................................ 43

Escobar v. Montee, 895 F.3d 387 (5th Cir. 2018) .................................................... 35

Est. of Alire by Alire v. Wihera,
   No. 23-1213, 2024 WL 5183300 (10th Cir. Dec. 20, 2024) ....................................... 36, 42

Est. of Larsen ex rel. Sturdivan v. Murr, 511 F.3d 1255 (10th Cir. 2008) ........................... 36

Est. of Turnbow v. Ogden City, 386 F. App'x 749 (10th Cir. 2010) ................................... 35

Est. of Valverde v. Dodge, 967 F.3d 1049 (10th Cir. 2020) ........................................... 31

iv

Fisher v. City of Las Cruces, 584 F.3d 888 (10th Cir. 2009) ...................................... 48

Graham v. Connor, 490 U.S. 386 (1989) ............................................ 31, 32, 33, 34, 38

Gross v. Pirtle, 245 F.3d 1151 (10th Cir. 2001) ............................................. 32

Gutierrez v. Hackett, 131 Fed. Appx. 621 (10th Cir. 2005) ................................ 32, 40

Hardman v. Roosevelt City,
    No. 2:18-cv-00785-DBP, 2019 WL 2578586 (D. Utah June 24, 2019) ................... 53

Hinton v. City of Elwood, 997 F.2d 774, 781 (10th Cir. 1993) ......................... 33, 40, 46

Holland v. Harrington, 268 F.3d 1179 (10th Cir. 2001) ..................................... 30

Ibarra v. Lee, No. 22-5094, 2023 WL 6939236 (10th Cir. Oct. 20, 2023) ................... 33

In re Est. of Bleck ex rel. Churchill, 643 F. App'x 754 (10th Cir. 2016) .................. 35

Jarrett v. Town of Yarmouth, 331 F.3d 140 (1st Cir. 2003) ............................... 35

Jensen ex rel. Jensen v. Cunningham, 2011 UT 17, 250 P.3d 465 ......................... 53

Jiron v. City of Lakewood, 392 F.3d 410 (10th Cir. 2004) ........................... 35, 36, 45

Johnson v. Scott, 576 F.3d 658 (7th Cir. 2009) ........................................... 41

Jones v. Norton, 3 F. Supp. 3d 1170 (D. Utah 2014), aff'd, 809 F.3d 564 (10th Cir. 2015) ....... 44

Marquez v. City of Albuquerque, 399 F.3d 1216 (10th Cir. 2005) ................. 32, 34, 36, 38

Matthews v. Jones, 35 F.3d 1046 (6th Cir.1994) ......................................... 36

Mazoch v. Carrizales, 733 Fed.Appx. 179 (5th Cir. 2018) ............................... 33

Mecham v. Frazier, 500 F.3d 1200 (10th Cir. 2007) .................................. 31, 39

Medina v. Cram, 252 F.3d 1124 (10th Cir. 2001) ........................................ 41

Mendoza v. Block, 27 F.3d 1357 (9th Cir. 1994) ......................................... 41

Mglej v. Garfield Cty., No. 2:13-CV-713, 2014 WL 2967605 (D. Utah July 1, 2014) ......... 54, 55

Miller v. Clark County, 340 F.3d 959 (9th Cir. 2003) .................................... 41

Mocek v. City of Albuquerque,
    3 F. Supp. 3d 1002 (D.N.M. 2014) aff'd, 813 F.3d 912 (10th Cir. 2015) ............................... 30

Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978) .................................................... 46

Moya v. City of Clovis,
    No. CV 18-494 GBW/KRS, 2019 WL 6255217 (D.N.M. Nov. 22, 2019),
    aff'd, 829 F. App'x 346 (10th Cir. 2020) ...................................................... 35, 36, 38, 40, 41

P.J. ex rel. Jensen v. Utah,
    No. 2:05CV00739 PGC, 2006 WL 1702585 (D. Utah June 16, 2006) ................................... 53

Palacios v. Fortuna, 61 F.4th 1248 (10th Cir. 2023) .................................................. 33, 35, 36, 52

Pearson v. Callahan, 555 U.S. 223 (2009) .................................................................. 30

Phillips v. James, 422 F.3d 1075 (10th Cir. 2005) ........................................................ 30

Potter v. Utah, Dep't of Human Servs.,
    No. 2:16-cv-00345-DN, 2017 WL 6345884 (D. Utah Aug. 29, 2017) ................................... 53

Rowell v. Bd. of Cty. Comm'rs. of Muskogee Cty., Okla., 978 F.3d 1165 (10th Cir. 2020) ...... 31

Saucier v. Katz, 533 U.S. 194 (2001) ..................................................................... 32, 36

Savannah v. Collins, 547 F. App'x 874 (10th Cir. 2013) .................................................. 44

Schneider v. City of Grand Junction Police Dep't, 717 F.3d 760 (10th Cir. 2013) ..................... 46

Scott v. Harris, 550 U.S. 372 (2007) ....................................................................... 31

Spackman ex rel. Spackman v. Bd. of Educ. of Box Elder Cnty. Sch. Dist.,
    2000 UT 87, 16 P.3d 533 ............................................................................... 53

Thomas v. Durastanti, 607 F.3d 655 (10th Cir. 2010) ..................................................... 31

Thomson v. Salt Lake County, 584 F.3d 1304 (10th Cir. 2009) ........................................... 35, 38

Univ. of Utah v. Shurtleff, 2006 UT 51, 144 P.3d 1109 .................................................. 53

Walker v. Anderson,
    No. 23-CV-0008-CVE-JFJ, 2024 WL 3905733 (N.D. Okla. Aug. 22, 2024) ........................... 33

Waller v. City & Cnty. of Denver, 932 F.3d 1277 (10th Cir. 2019)................................ 46, 47, 49

Weise v. Casper, 593 F.3d 1163 (10th Cir. 2010) ........................................................ 30

White v. Pauly, 137 S. Ct. 548 (2017) ........................................................................ 42

Wood v. Farmington City, 910 F. Supp. 2d 1315, 1329 (D. Utah 2012) ..................... 54

Zuress v. City of Newark, 815 F. App'x 1 (6th Cir. 2020)................................... 35, 39, 40

**Statutes**

Utah Code § 76-5-108.................................................................................................. 34

Utah Code § 76-6-202.................................................................................................. 34

Utah Code § 77-7-18 ................................................................................................... 34

Utah Code § 77-36-1.1 .................................................................................................. 7

Utah Code § 77-36-2.4.............................................................................................. 7, 34

Utah Code § 78B-7-119 ................................................................................................. 7

**Rules**

Fed. R. Evid. 407 ......................................................................................................... 49

## INTRODUCTION AND STATEMENT OF RELIEF SOUGHT

This case arises from Salt Lake City police officers responding to a call for service from a terrified fifteen-year-old girl. She had barricaded herself in her bedroom and was reporting her father, Plaintiff Jeffrey Ryans ("Ryans"), was at their home in violation of a protective order, had assaulted her mother, and was now attempting to gain entry to rooms that occupants of the house were hiding in. Police arrived at the property with a certified and highly trained K9 and interrupted Ryans during his attempt to flee the scene. After Ryans repeatedly failed to comply with orders to get on the ground—and having been warned that his repeated failure would result in use of the K9—Officer Pearce ordered his K9 to bite. Officer Jewkes then quickly secured Ryans in handcuffs and the K9 was released. Ryans contends this force was excessive and has brought numerous claims against the officers and Salt Lake City under the Fourth Amendment of the United State Constitution and under six different provisions of the Utah State Constitution. Defendants move for entry of judgment on all claims.

Ryans' Fourth Amendment claims against the individual officers fail because Ryans cannot meet his burden to show a violation of constitutional rights or his separate and independent burden to show the rights at issue were clearly established. Ryans' Fourth Amendment claims against the City fail for similar reasons. He cannot show a violation of constitutional rights, which is fatal to his section 1983 claims against the City. And, even if he could meet this burden, he cannot satisfy the additional elements necessary to establish a section 1983 claim against a governmental entity. Finally, Ryans cannot establish essential elements of his state constitutional claims, including the claims are self-executing, the violation was flagrant, and existing remedies do not redress his injuries. Judgment should enter for Defendants on all claims.

## BACKGROUND FACTS

On December 16, 2019, Salt Lake City police were called to 765 Justin Kay Court when Alicia Ryans, Ryans' ex-wife, called 911 for police response because Ryans had assaulted her. When officers arrived, they spoke with Ryans and his wife separately, and also their children, who confirmed their mother's story of assault. Ryans was arrested and Ms. Ryans filed for a protective order, which was granted shortly thereafter and served on Ryans.

Just a few months later on March 13, 2020, police were called to the property again, when Ryans attempted to enter the property in violation of the protective order. Ms. Ryans called 911, and Ryans can be heard yelling in the background while she is making the 911 call.

The following month, on April 24, 2020, Ryans violated the protective order again. Just after 2:00 a.m., 911 dispatch received a call from Ryans' fifteen-year-old daughter, who was hiding in her room. She reported in whispered tones, concerned her father might hear, that Ryans was at their home in violation of a protective order and physically assaulting her mother. Ryans can be heard yelling and screaming in the background as she tells the dispatcher she does not want to leave her room and begs the officers to "please hurry." Officer Orgill, who had responded to the December 2019 call to this property, Defendant Officer Jewkes, and Defendant Officer Pearce and his K9 Tuco were dispatched to the scene. All three officers recorded their response on body camera.

Officer Pearce was the first to arrive. He parked at the end of Justin Kay Court where it intersects with 1300 South. He took K9 Tuco out of his truck on leash and walked down the street to the property. When he got to the property he paused for a moment to assess the scene. The property was entirely dark, except for one light on in a room above the garage at the front of the

property.  He could hear a male voice yelling from inside the property, which can also be heard on the 911 call.  He walked diagonally across the front of the property and took a position on the northwest corner of the property—by the garage.  Almost immediately on reaching the garage, dispatch informed the officers over the radio that Ryans had gone downstairs and may be attempting to leave the property.  At this time, Officers Jewkes and Orgill arrived on scene.

They signaled to Ryans' thirteen-year-old son who was looking at them from an upstairs window.  He came down to let them in and told them his father was in the basement before running back upstairs to hide.  Officer Jewkes spoke with Ms. Ryans while Officer Orgill stood in the stairwell to the basement and began to announce loudly that it was Salt Lake City police department and called for Ryans to come out of the basement.

As Officers Jewkes and Orgill went inside the home, Officer Pearce moved from his position at the corner of the garage to the west side of the property to see if he could hear or see anything in the property's side yard or backyard.  Having spent several minutes doing this, and being unable to see into the backyard, he decided to change positions to the east side of the property.  He walked back across the front of the property, pausing briefly to go up the front stairs where he could hear and see Officer Orgill shouting loudly for Ryans to come out from the basement, before proceeding to the east side of the property.  When Officer Pearce got to the east side of the property, he saw the sole window on that side of the property—a basement window— was now lit and open, despite the cold April temperature that night.  Ryans was in the yard by the back wall, bare-footed, with his back to Officer Pearce.  A fence separated Officer Pearce from the side and backyard where Ryans was located.

The officers' arrival and movements around the property until Officer Pearce located

3

Ryans in the backyard are depicted below:[1]



Based on everything he had heard and seen so far—reports of violation of a protective order and domestic violence, a yelling voice, reports of a man attempting to leave, police calling for him to come out of the basement, and a now open and lit window—Officer Pearce believed Ryans had exited the house through the east side window and was attempting to flee over the back wall. Thus, on seeing Ryans, Officer Pearce immediately began giving him orders to get on the ground. Ryans did not comply. Instead, he started moving towards the front fence and began providing incredible explanations for his presence in the backyard, including he was going to work. Officer Pearce then switched to ordering him to come over to the front fence, which would at least get him away from the back wall, which he eventually did.

Officers Jewkes and Orgill heard Officer Pearce giving orders and immediately exited the home. Once all the officers were outside, Officer Orgill took a position keeping Ryans at the front fence, while Officers Pearce and Jewkes and K9 Tuco went around the house to the backyard to

---

[1] A copy is also attached as **Exhibit 1**.

take Ryans into custody, as they are required to do for all violations of protective orders.  The officers' path to the backyard is depicted below:[2]



As the officers rounded the south-east corner of the property to where Ryans was now standing, both officers resumed their orders for Ryans to get on the ground.  Officer Orgill also told Ryans to get on the ground: "Listen to him.  Get on the ground."  Ryans did not comply.  Officer Pearce then delivered a boot strike to Ryans left thigh[3] in an attempt to get him to go to the ground without the use of K9 Tuco.  Again, Ryans did not comply.  He went to one knee, grabbed the fence above him with an overhand grip, and turned to face Officer Pearce, which the officers recognized as an advantageous position for resisting further physical efforts to take him to the ground and an easy position to stand back up from.

Ryans was ordered to get on the ground several more times, which were not complied with, and Officer Pearce instructed K9 Tuco to bite, using the command "hit."  Officer Jewkes immediately set to putting Ryans in handcuffs and the bite was released as soon as the handcuffs

---

[2] A copy is also attached as **Exhibit 2**.
[3] A boot strike is delivered to the left thigh and is an attempt to get someone to go to the ground with mild pain compliance.  **Exhibit 10**, Pearce Trial Testimony, 110:16-111:6.

were secured.

After the incident, Ryans engaged his current civil attorney, who organized and attended interviews with Ryans and the District Attorney's office to pursue criminal assault charges against Officer Pearce.  In February 2024, after a four-day trial, a jury delivered a not guilty verdict finding the force Officer Pearce used to effect the arrest was reasonable and he was exonerated of all charges.

In contrast, Ryans pled guilty to charges for assault from the December 2019 incident, violation of the protective order in March 2020, and violation of the protective order again on April 24, 2020, the night at issue here.  He also pled guilty to several additional charges for assault and violation of the protective order occurring from July 2020 until September 2021 and to a related federal charge.  As a result, Ryans has spent a considerable amount of time incarcerated since this incident.

## **STATEMENT OF UNDISPUTED MATERIAL FACTS**

**A.    911 Receive a Call from a Terrified Fifteen-Year-Old Girl.**

1.    Just after 2:00 a.m. on the morning of April 24, 2020, 911 dispatch received a call from a terrified 15-year-old girl.  **Exhibit 5**, 911 Call.

2.    She reported that she was calling from 765 Justin Kay Court and that her father, Plaintiff Jeffrey Ryans, was at the home she shared with her mother and two brothers in violation of a protective order.  **Exhibit 5**, 911 Call, min. 00:00-1:15.

3.    She told the dispatcher that "my dad is doing very bad things to our family" and confirmed to the dispatcher that Ryans had hit her mom:

> Dispatcher: OK did he strike your mom.
> Caller: Yes.  And he's still yelling.

**Exhibit 5**, 911 call, min. 00.53-57.

4.      She also told the dispatcher that she did not know how he got into the property—that they had been "hanging out with friends because it was her Mom's friend's birthday" and they returned home to find him in the home.  **Exhibit 5**, 911 Call, min 1:36-2:10.

5.      She told the dispatcher that she was hiding in her room as she made the call, that she did not want to go downstairs, and she asked the police to "please hurry."  **Exhibit 5**, 911 Call, min 1:15-20, 3:28-45 & 11:58-12:12.

6.      Ryans can be heard yelling and screaming in the background throughout the call. **Exhibit 5**, 911 Call.

7.      Domestic violence and violation of protective orders are considered serious crimes in Utah, which require mandatory arrest and transportation to jail and are convictable as felonies for repeat offenders.  *See* Utah Code § 77-36-2.4; Utah Code § 78B-7-119; Utah Code § 77-36-1.1.

8.      The call was logged as a "Domestic Disturbance in Progress" and categorized as a "Priority 2" call, which is the second most serious type of call.  **Exhibit 6**, CAD Call; **Exhibit 9**, Pearce Decl. ¶¶ 18 & 22; **Exhibit 15**, Jewkes Decl. ¶ 8.

**B.      Officers Jewkes and Orgill are Dispatched on the Call.**

9.      Officers Jewkes and Orgill, patrol officers assigned to the area of the City where the home is located, were dispatched as the initial and backing officers.[4]  **Exhibit 6**, CAD Call; **Exhibit 15**, Jewkes Decl. ¶¶ 5-6; **Exhibit 16**, Jewkes Trial Testimony, 5:24-7:2; **Exhibit 18**, Orgill Trial

---

[4] Officer Jewkes is currently assigned to the training division.  **Exhibit 15**, Jewkes Decl. ¶ 5, n.1.

Testimony, 6:23-9:7.

10.     Information was provided over the radio that Ryans was at the property in violation of a protective order, abusing his wife, and it was unknown how he had gained entry to the property:

> **Physical domestic**. 765 Justin Kay Court. 1250 South. **Complaint's father is there abusing his wife. There's a lot of yelling and screaming in the background** in the male half is going to be Jeffrey Ryans. I believe **there is a protective order in place**. He drives a black Yukon with front end damage. **He's parked in the garage. Unknown how he got inside.**

**Exhibit 7**, Radio Dispatch, 00.08-30.

11.     Officers were also informed that the call had come from a minor, who was now hiding in her room:

> Be advised there is going to be 3 kids inside the home. One is sleeping. **The complaint is hiding in her room. The brother is trying to keep the dad from going in to that room.**

**Exhibit 7**, Radio Dispatch, 02:39-54.

12.     This information was also provided to the officers on their MDTs, which are the computers that are standard issue in any police vehicle and are located in the central console area. **Exhibit 6**, CAD call; **Exhibit 15**, Jewkes Decl. ¶¶ 9-10; **Exhibit 16**, Jewkes Trial Testimony, 41:15-42:1; **Exhibit 18**, Orgill Trial Testimony 36:11-39:11.

13.     Both officers heard this information, and Officer Jewkes also verified that the protective order was still active. **Exhibit 15**, Jewkes Decl. ¶¶ 9-11; **Exhibit 16**, Jewkes Trial Testimony, 41:15-48:1; **Exhibit 18**, Orgill Trial Testimony 6:23-9:7.

**C.     Officer Pearce is also Dispatched on the Call.**

14.     Officer Pearce, a K9 handler assigned to Salt Lake City's K9 unit,[5] was also dispatched on the call. **Exhibit 9**, Pearce Decl. ¶¶ 5 & 17-25, **Exhibit 10**, Pearce Trial Transcript, 47:24-67:20.

15.     Unlike patrol officers, K9 teams, *i.e.*, a K9 handler and his assigned canine, are deployed city-wide. **Exhibit 9**, Pearce Decl. ¶ 15, **Exhibit 10**, Pearce Trial Transcript, 48:4-12; **Exhibit 20**, Salt Lake City Policy 308.5.

16.     Salt Lake City policy directs that K9 officers "should offer assistance in any situation where a canine could be effectively utilized" and when available, K9 officers are expected to "assist with priority crimes-in-progress and crimes just-occurred." **Exhibit 20**, Salt Lake City Policy 308.5; **Exhibit 9**, Pearce Decl. ¶ 16; **Exhibit 10**, Pearce Trial Transcript, 48:4-12 & 57:15-17.

17.     At approximately 2:07 a.m. on the morning of April 24, 2020, Officer Pearce was on duty with his K9, Tuco, in the area of Glendale Middle School, which is approximately two blocks from the location of the caller's home, when he heard the call announced on the radio. **Exhibit 9**, Pearce Decl. ¶ 17, **Exhibit 10**, Pearce Trial Transcript, 48:21-67:20; **Exhibit 12**, Pearce Police Report; **Exhibit 13**, Pearce Depo. 58:3-61:11.

18.     Officer Pearce heard the information provided on the radio, identifying it as a physical domestic violence call, that there was a protective order in place, the suspect had gained unknown entry to the home, had assaulted his wife, children were hiding, and the suspect was attempting to gain entry to a room. **Exhibit 9**, Pearce Decl. ¶¶ 18-19, **Exhibit 10**, Pearce Trial Transcript, 48:21-67:20; **Exhibit 12**, Pearce Police Report; **Exhibit 13**, Pearce Depo. 58:3-61:11.

---

[5] Officer Pearce is currently assigned to the training unit. **Exhibit 15**, Jewkes Decl. ¶ 5, n.1.

19.     He also reviewed the information provided on the MDT that repeated this information and identified it as a priority 2 crime in progress. **Exhibit 9**, Pearce Decl. ¶ 20, **Exhibit 10**, Pearce Trial Transcript, 48:21-67:20.

20.     Per policy, Officer Pearce responded to assist and was dispatched on the call. **Exhibit 7**, Radio Traffic min 3:45-52; **Exhibit 9**, Pearce Decl. ¶¶ 15-25, **Exhibit 10**, Pearce Trial Transcript, 48:4-12 & 57:15-17.

**D.     The 765 Justin Kay Court Property.**

21.     765 Justin Kay Court, Salt Lake City, is located at the end of a cul de sac. **Exhibit 3**, Google Maps Satellite Image of Justin Kay Court.



22.     It is a split-level home with a living room, dining area, kitchen and bedrooms on the upper level and a garage, lounge area and bedroom in the basement. **Exhibit 4**, Google Maps

Street View Image of Justin Kay Court.  *See also* **Exhibit 23**, Ryans Depo. 82:13-97:4, 107:2-108:14 & 119:7-21; **Exhibit 24**, Ryan's Floor Plan of 765 Justin Kay Court.



23.    It has a back yard that is accessible through a gate on the west side of the property. **Exhibit 8**, Pearce Body Camera, 8:15-35; **Exhibit 14**, Jewkes Body Cam. 6:40-50.

**E.    Officers Arrive on Scene.**

24.    Officer Pearce was the first officer to arrive on scene.  **Exhibit 8**, Pearce Body Camera, 0:00-2:15; **Exhibit 9**, Pearce Decl. ¶ 28, **Exhibit 10**, Pearce Trial Transcript, 69:12-72:23; **Exhibit 13**, Pearce Depo. 55:20-57:11.

25.    He was not familiar with this particular street and, as a result, he parked his patrol vehicle at the end of the street, where Justin Kay Court intersects with 1300 South.  **Exhibit 8**, Pearce Body Camera, 0:00-1:30; **Exhibit 9**, Pearce Decl. ¶ 26; **Exhibit 10**, Pearce Trial Transcript, 69:12-72:23; **Exhibit 13**, Pearce Depo. 55:20-57:11.

26.    He took his K9, Tuco, out of the truck on leash and together they walked down Justin Kay Court until they reached number 765, the caller's home.  **Exhibit 8**, Pearce Body

Camera, 0:00-1:30; **Exhibit 9**, Pearce Decl. ¶ 27, **Exhibit 10**, Pearce Trial Transcript, 69:12-72:23;

**Exhibit 13**, Pearce Depo. 55:20-57:11.

27.    When Officer Pearce arrived at the address, he could see the house was largely

dark, except for one light that was on in a room above the garage.  **Exhibit 8**, Pearce Body Camera,

1:30-2:00; **Exhibit 9**, Pearce Decl. ¶¶ 29-31, **Exhibit 10**, Pearce Trial Transcript, 72:24-74:10.



28.    He doubled back to assess the property from just short of the mailbox located on

the northeast corner of the property.  **Exhibit 8**, Pearce Body Camera, 1:30-2:00; **Exhibit 9**, Pearce

Decl. ¶ 32, **Exhibit 10**, Pearce Trial Transcript, 72:24-74:10.



29.    From there he could see the sole window located on the east side of the property was dark and closed.  **Exhibit 8**, Pearce Body Camera, 1:30-2:00; **Exhibit 9**, Pearce Decl. ¶ 33; **Exhibit 10**, Pearce Trial Transcript, 72:24-74:10; **Exhibit 13**, Pearce Dep. 104:13-105:8.



30.    As Officer Pearce was making this assessment of the property, he heard a male voice yelling from inside the property.  **Exhibit 21**, Synchronized Body Cam & 911 Call, 10:30-55; **Exhibit 5**, 911 Call, 9:11-10:40; **Exhibit 9**, Pearce Decl. ¶ 34; **Exhibit 10**, Pearce Trial Transcript, 74:11-75:11; **Exhibit 12**, Pearce's Police Report.

31.    He then proceeded to the west side of the property diagonally across the driveway and took a position standing at the northwest corner of the garage.  **Exhibit 8**, Pearce Body Camera, 2:00-15; **Exhibit 9**, Pearce Decl. ¶ 35, **Exhibit 10**, Pearce Trial Transcript, 76:14-79:10; **Exhibit 12**, Pearce Police Report.

32.    As he reached this spot, dispatch informed the officers over the radio that Ryans was going downstairs and may be attempting to flee the scene:

"Male is now going downstairs.  Complainant says he's possibly trying to leave."

**Exhibit 8**, Pearce Body Camera, 2:15-20; **Exhibit 9**, Pearce Decl. ¶ 36; **Exhibit 10**, Pearce Trial

Transcript, 75:11-78:24.

33. At this time, Officers Jewkes and Orgill were arriving on scene.  **Exhibit 8**, Pearce Body Cam., 2:15-45; **Exhibit 9**, Pearce Decl. ¶ 41; **Exhibit 10**, Pearce Trial Transcript, 78:20-24.

34. Officers Jewkes and Orgill proceeded up the front steps, and Officer Pearce turned his attention to seeing if he could hear or see anyone in the yard on the west side of the property or in the backyard on the west side of the property.  **Exhibit 8**, Pearce Body Cam, 2:45-6:30; **Exhibit 14**, Jewkes Body Cam 1:45-2:15; **Exhibit 17**, Orgill Body Cam 1:10-1:40; **Exhibit 9**, Pearce Decl. ¶ 41; **Exhibit 10**, Pearce Trial Transcript, 75:11-78:24; **Exhibit 12**, Pearce Police Report.

35. Ryans' thirteen-year-old son let Officers Jewkes and Orgill into the property and told the officers his father, Ryans, was downstairs in the basement.  **Exhibit 14**, Jewkes Body Cam 1:45-2:45 & 17:35-50; **Exhibit 17**, Orgill Body Cam 1:10-2:10; **Exhibit 15**, Jewkes Decl. ¶¶ 16-17; **Exhibit 11**, Transcript of Preliminary Hearing, 86:2-25.

36. Officer Jewkes then proceeded to speak with Ms. Ryans to gather information about what had occurred, and Officer Orgill stood at the top of the stairs that go down to the basement and called for Ryans to come out of the basement: "Jeffrey.  Salt Lake City Police Department.  Come up to the stairs."  **Exhibit 14**, Jewkes Body Cam 3:00-5:45; **Exhibit 17**, Orgill Body Cam 2:25-5:10.

37. Officer Pearce's body camera, Officer Jewkes body camera and the 911 call are synchronized in **Exhibit 21**.

**F.    Ryans is Located in the Backyard in an Apparent Attempt to Flee the Scene.**

38. Being unable to see into the backyard from his vantage point on the west side of

the property, Officer Pearce decided to move to the east side of the property. **Exhibit 8**, Pearce Body Camera, 6:30-7:15; **Exhibit 9**, Pearce Decl. ¶ 42; **Exhibit 10**, Pearce Trial Transcript, 77:9-85:8.

39.     He walked across the front of the property, pausing briefly to go up the front steps where he could hear and see Officer Orgill shouting loudly to Ryans to come out from the basement. **Exhibit 8**, Pearce Body Camera, 6:30-7:15; **Exhibit 9**, Pearce Decl. ¶ 43; **Exhibit 10**, Pearce Trial Transcript, 77:9-85:8.

40.     Officer Pearce then proceeded to the east side of the property at which point he saw the sole window on the east side of the property was now open with a light on and Ryans was standing by the back wall. **Exhibit 8**, Pearce Body Camera, 7:15-7:28; **Exhibit 9**, Pearce Decl. ¶¶ 44-47; **Exhibit 10**, Pearce Trial Transcript, 85:9-87:8; **Exhibit 12**, Police Report; **Exhibit 13**, Pearce Dep. 104:13-105:8.



41.     He was barefooted, facing away from Officer Pearce, and appeared to have something in his hands. **Exhibit 9**, Pearce Decl. ¶ 47, **Exhibit 10**, Pearce Trial Transcript, 85:9-

87:8; **Exhibit 12**, Police Report; **Exhibit 13**, Pearce Dep. 105:12-13.

42.     Based on everything he had heard and seen, Officer Pearce believed Ryans had jumped out the window on the east side of the property and was attempting to flee over the back wall. **Exhibit 9**, Pearce Decl. ¶ 48, **Exhibit 10**, Pearce Trial Transcript, 87:18-88:22; **Exhibit 13**, Pearce Dep. 104:13-105:23.

43.     A cinder block was turned on its side like a step and a jacket, cap, and shoes were found by the wall where Ryans was standing. **Exhibit 22**, Crime Scene Photo.



44.     The officers' arrival and movements around the property until Officer Pearce located Ryans in the backyard are depicted in **Exhibit 1**.[6]

**G.     Ryans Fails to Follow Repeated Orders to Get on the Ground.**

45.     On seeing Mr. Ryans standing by the back wall, and suspecting he was attempting to flee, Officer Pearce ordered him no less than four times to get on the ground and warned him

---

[6] *See* **Exhibit** 8, Pearce Body Cam. 0:00-7:30; **Exhibit 9**, Pearce Decl. ¶ 45; **Exhibit 14**, Jewkes Body Cam. 0:00-6:00; **Exhibit 15**, Jewkes Decl. ¶ 15.

that he could be bit by the K9 if he refused to comply:

> <u>Officer Pearce</u>: Hey. Get on the ground.
> <u>Officer Pearce</u>: Get on the ground.
> <u>Officer Pearce</u>: Get on the ground or your gonna get bit.
> <u>Officer Pearce</u>: Police Department . . .Get on the ground.

**Exhibit 8**, Pearce Body Camera, 7:28-38.

46.    K9 Tuco also began barking loudly making his presence known.  **Exhibit 8**, Pearce Body Camera, 7:28-38; **Exhibit 10**, Pearce Trial Testimony, 90:11-13.

47.    Officer Pearce testified he issued this order for tactical and safety reasons. Specifically, it limits the suspect's ability to fight or flee, limits a suspect's ability to access a weapon, and indicates to the officer if the suspect is willing to comply with orders.  **Exhibit 10**, Pearce Trial Testimony, 89:4-23; **Exhibit 9**, Pearce Decl. ¶ 50.

48.    Officers Jewkes and Orgill heard Officer Pearce shouting commands to Ryans and immediately exited the property to assist.  **Exhibit 14**, Jewkes Body Cam, 5:45-6:00; **Exhibit 17**, Orgill Body Cam, 5:10-25; **Exhibit 15**, Jewkes Decl. ¶¶ 20-21; **Exhibit 11**, Transcript of Preliminary Hearing, 87:19-22.

49.    Ryans did not get on the ground.  Instead, he took a few steps towards the front fence and stopped.  So Officer Pearce then began ordering him to come over to the front fence where Officer Pearce was standing because that would, at least, move him away from the back wall and further attempts to flee.  **Exhibit 8**, Pearce Body Camera, 7:38-8:15; **Exhibit 17**, Orgill Body Cam, 5:15-50; **Exhibit 9**, Pearce Decl. ¶¶ 51-53; **Exhibit 10**, Pearce Trial Transcript, 90:18-94:11; **Exhibit 12**, Pearce Police Report; **Exhibit 13**, Pearce Dep. 105:24-106:19.

50.    Again, Officer Pearce issued four separate orders.

<u>Officer Pearce</u>: Come out here . . .

> <u>Officer Pearce</u>: What's your name . . . What's your name?
> <u>Officer Orgill</u>: Jeffrey
> <u>Officer Pearce</u>: Get out here. . . . . Come out here right now.  Keep your hands up.
> <u>Ryans</u>: I'm just going to work.
> <u>Officer Pearce</u>: Come here.  Your gonna get bit.  Get out here or your gonna get bit.

**Exhibit 8**, Pearce Body Camera, 7:38-8:15; **Exhibit 17**, Orgill Body Cam, 5:15-50.

51.     Each time Officer Pearce told Ryans to walk towards him, Ryans took only a few steps, stopped, and had to be told again.  **Exhibit 8**, Pearce Body Camera, 7:38-8:15; **Exhibit 17**, Orgill Body Cam, 5:15-50.

52.     Ryans also failed to respond to Officer Pearce's orders to provide his name, with Officer Orgill (who knew Ryans from being called to a prior domestic violence call at that property in December 2019) provided his name and verified his identify.  **Exhibit 8**, Pearce Body Camera, 7:42-46; **Exhibit 17**, Orgill Body Cam, 5:25-30; **Exhibit 11**, Transcript of Preliminary Hearing, 88:18-89:4.

53.     K9 Tuco continued barking loudly throughout this encounter.  **Exhibit 8**, Pearce Body Camera, 7:28-8:15.

54.     Officer Orgill then took a position at the front fence engaging Ryans while Officers Pearce and Jewkes and K9 Tuco made their way to the backyard via the gate on the west side of the property.  **Exhibit 8**, Pearce Body Cam, 8:10-45; **Exhibit 14**, Jewkes Body Cam, 6:15-45; **Exhibit 17**, Orgill Body Cam, 5:50-6:30; **Exhibit 10**, Pearce Trial Testimony, 94:12-96:20

55.     As the officers made their way to the back yard, Officer Pearce told Officer Jewkes what he had seen: "He was trying to jump the fence Jewkes."  **Exhibit 8**, Pearce Body Cam 8:15-20; **Exhibit 10**, Pearce Trial Testimony, 95:15-20; **Exhibit 16**, Jewkes Trial Testimony, 60:19-25; **Exhibit 9**, Pearce Decl. ¶ 56; **Exhibit 15**, Jewkes Decl. ¶ 25.

56.     The officers' path to the backyard is depicted in **Exhibit 2**.[7]

57.     As the officers rounded the back of the house to the area where Ryans was now standing, the officers resumed their orders for Ryans to get on the ground.  **Exhibit 8**, Pearce Body Cam, 8:45-9:15; **Exhibit 14**, Jewkes Body Cam, 7:00-30; **Exhibit 17**, Orgill Body Cam, 6:30-50; **Exhibit 10**, Pearce Trial Testimony, 96:20-98:7.

58.     Specifically, all officers (including Officer Orgill) ordered him no less than six more times to get on the ground and warned him for the third time that he could be bit if he did not comply:

> Officer Pearce: Get on the ground . .
> Officer Pearce: Get on the ground or your gonna get bit . . .
> Officer Orgill:   Listen to him.  Get on the ground.
> Officer Jewkes: Get on the ground.
> Officer Jewkes: Get on your knees rights now.
> Officer Jewkes: Get down.

**Exhibit 8**, Pearce Body Cam 8:45-8:55; **Exhibit 14**, Jewkes Body Cam, 7:00-20; **Exhibit 17**, Orgill Body Cam, 6:30-45.

59.     At this point, because Ryans was not getting on the ground, Officer Pearce delivered a boot strike to Ryans' left thigh in an attempt to convey the seriousness of the situation and gain compliance with his orders to get on the ground.  **Exhibit 8**, Pearce Body Cam 8:55-58; **Exhibit 14**, Jewkes Body Cam, 7:12-7:15; **Exhibit 17**, Orgill Body Cam, 6:37; **Exhibit 9**, Pearce Decl. ¶ 61; **Exhibit 10**, Pearce Trial Testimony, 109:11-111:6; **Exhibit 15**, Jewkes Decl. ¶ 31; **Exhibit 16**, Jewkes Trial Testimony, 63:3-19; **Exhibit 12**, Pearce Police Report; **Exhibit 13**, Pearce Dep. 153:7-22.

---

[7] *See* **Exhibit** 8, Pearce Body Cam. 8:00-45; **Exhibit 9**, Pearce Decl. ¶ 58; **Exhibit 14**, Jewkes Body Cam. 6:00-7:10; **Exhibit 15**, Jewkes Decl. ¶ 26.

60.     Officer Pearce then took a step back to regain his balance and to create distance between himself and Ryans so Ryans would not accidentally be bitten by K9 Tuco.  **Exhibit 14**, Jewkes Body Cam, 7:12-7:15; **Exhibit 9**, Pearce Decl. ¶ 62; **Exhibit 10**, Pearce Trial Testimony, 111:7-17.

61.     Ryans did not get on the ground.  **Exhibit 8**, Pearce Body Cam 8:55-58; **Exhibit 14**, Jewkes Body Cam, 7:12-15.

62.     He went to one knee and grabbed the fence with an overhand grip and also turned his body so he was looking directly at Officer Pearce.  **Exhibit 8**, Pearce Body Cam 8:55-58; **Exhibit 14**, Jewkes Body Cam, 7:12-15; **Exhibit 9**, Pearce Decl. ¶ 63; **Exhibit 10**, Pearce Trial Testimony, 111:18-112:15; **Exhibit 12**, Pearce Police Report; **Exhibit 13**, Pearce Dep. 153:23-154:9.



63.     All officers on scene have testified that Ryans adopting this position was concerning.  It showed Ryans was not complying with their orders to get on the ground, he now had leverage to resist further physical efforts to take him to the ground, and he could easily stand back up from this position:

Attorney: **How would you in your own words describe that kind of a position?**

> Officer Pearce: I would -- I would say **it was a position of advantage**.
> Attorney: What's a position of advantage?
> Officer Pearce: **It affords somebody the opportunity to make a move with very little effort.**

**Exhibit 10**, Pearce Trial Testimony, 112:16-22.

> Officer Pearce: He dropped to one knee, which through my years of training and experience is still an advantageous position, to be on one knee. Not only that, coupled with that, **he now was holding onto the chain link fence in an overhand grip, which provides leverage and a significant advantage to resist any physical efforts to pull him to the ground physically, one way or another, and it gives him an advantage to pull himself back up**, which furthered my concern for my own safety and my officers' safety.

**Exhibit 13**, Pearce Dep. 153:25-154:9. *See also* **Exhibit 9**, Pearce Decl. ¶ 64.

> Attorney: What is the problem with the position of being on one knee with a hand on the fence?
> Officer Jewkes: **When you're on one knee it's really easy to get up from that one knee. You still have great range of mobility. And by grabbing the fence, that could also increase the speed at which someone could stand back up and get back on both feet**.

**Exhibit 16**, Jewkes Trial Testimony, 69:6-12. *See also* **Exhibit 15**, Jewkes Decl. ¶¶ 32-33.

> Attorney: Okay. **So with an individual with just one knee on the ground and not completely prone on the ground, is that person still able to strike officers?**
> Officer Orgill: They are still able to fight, yes.
> Attorney: **Is that person able to rise up and begin to flee?**
> Officer Orgill: **Yes.**
> Attorney: Okay. **Is this still a dangerous situation for police officers at that time?**
> Officer Orgill: **It is.**

**Exhibit 11**, Transcript of Preliminary Hearing, 92:12-93:4.

    64.    Officer Pearce further testified that this, in addition to the information he already

had, indicated to him that Ryans was actively resisting and indeed preparing to fight:

> Attorney: Were you concerned?
> Officer Pearce: Yes.

Attorney: And why?

Officer Pearce: Again, all of the facts that I knew to be true at this -- or reported to be true at this point. **My threshold information was that a serious crime had been committed. I had already interrupted him fleeing the back wall, or fleeing -- getting ready to flee over the back wall. I still am not sure what has happened inside. I don't know the status of the children.** I don't know any of that stuff. **I believe I have the sus -- the person that's responsible for these crimes in front of me. He is not complying with my commands to get on the ground. Not only is he not complying, he's taking actions to flat out disregard them, which is starting to raise my concern that I am now placing myself in danger**.

. . .

Attorney: At that moment in time, were you concerned that Jeffrey Ryans may fight?

Officer Pearce: Yes.

Attorney: Okay. Why was that?

Officer Pearce: Again, **he's in this position that I had had mentioned earlier, and now he has regained his position in an upright stature and now he's turning towards me**.

**Exhibit 10**, Pearce Trial Testimony, 112:23-114:7. *See also* **Exhibit 9**, Pearce Decl. ¶ 65; **Exhibit 13**, Pearce Dep. 153:25-154:9.

65.    After delivery of the boot strike, Officer Jewkes ordered Ryans to get all the way on the ground three more times:

Officer Jewkes: Get on the ground.  All the way down . . . on the ground.

**Exhibit 14**, Jewkes Body Cam, 7:15-20; **Exhibit 8**, Pearce Body Camera, 8:53-8:58.

66.    Ryans still did not comply with the officers' orders.  At that point Officer Pearce ordered K9 Tuco to bite, using the command "hit."[8]  **Exhibit 8**, Pearce Body Cam, 8:58-9:00; **Exhibit 14**, Jewkes Body Cam, 7:15-20; **Exhibit 9**, Pearce Decl. ¶ 66; **Exhibit 10**, Pearce Trial Testimony 114:8-15.

---

[8]  Officer Pearce repeats the word "hit" multiple times.  This was done to reinforce the original "hit" command.  It is not an instruction for Tuco to bite multiple times.  **Exhibit 9**, Pearce Decl. ¶ 66, n.2.

67.     Officer Jewkes gave Ryans two more orders to get on the ground, which he eventually complied with.  And then Officer Jewkes immediately ordered Ryans to put his hands behind his back so he could handcuff him:

> <u>Officer Pearce:</u>  Hit.  Hit.
> <u>Officer Jewkes:</u>  Get on the ground . . . .
> <u>Officer Jewkes:</u>  Get on the ground.
> <u>Officer Jewkes:</u> Put your hands behind your back . . . right now. . . . .  Put your hands behind your back right now.

**Exhibit 14**, Jewkes Body Cam 7:17-35.

68.     As soon as Officer Jewkes had both Ryans' hands secured in handcuffs, Officer Pearce ordered Tuco to release his bite.[9]  **Exhibit 14**, Jewkes Body Cam, 7:55-8:00; **Exhibit 8**, Pearce Body Cam 9:38-43, **Exhibit 9**, Pearce Decl. ¶¶ 69-70; **Exhibit 10**, Pearce Trial Testimony 119:15-121:17; **Exhibit 15**, Jewkes Decl. ¶ 38.

69.     Officer Pearce called for medical to respond and Ryans was helped to a chair. **Exhibit 8**, Pearce Body Cam, 10:00-05; **Exhibit 17**, Orgill Body Cam, 12:30-15:15.

**H.     Ryans' Behavior Was Extraordinary.**

70.     By the time Officer Pearce ordered K9 Tuco to bite, Ryans had been ordered to get on the ground no less than ten times by three different officers and had been warned three times that he would be bitten by the K9 if he continued not to comply.  **Exhibit 8**, Pearce Body Cam, 7:28-8:58, **Exhibit 14**, Jewkes Body Cam, 5:45-7:17; **Exhibit 17**, Orgill Body Cam, 5:15-6:50.

71.     The officers testified that domestic violence and violation of protective order calls are unpredictable, volatile, high-risk calls:

> <u>Attorney:</u>  So through your training and experience, what have you learned, in

---

[9]  Officer Jewkes testified it took him a couple seconds longer to secure Ryans in handcuffs than usual because of the size of Ryans wrists.  **Exhibit 15**, Jewkes Decl. ¶¶ 39-40.

general, about domestic violence cases?

Officer Pearce: They're -- generally they're -- they can be very dangerous.  There are a lot of emotions involved. They're volatile. They're unpredictable.

**Exhibit 10**, Pearce Trial Testimony, 14:1-6.  *See also* **Exhibit 9**, Pearce Decl. ¶¶ 37-40.

Officer Jewkes: Historically, in my experience, domestic violence are some of the most, high-risk and dangerous situations that we respond to.  They're very volatile. Lots of emotion. Lots of potential risk for all involved.

Attorney: What about protective order violations . . . .?

Officer Jewkes:  A protective order violation essentially tells us that there is past history of domestic violence.

**Exhibit 16**, Jewkes Trial Testimony, 31:24-32:10.  *See also* **Exhibit 15**, Jewkes Decl. ¶ 41.

Attorney: What about protective order violations? What's the difference between a call that's just a run-of-the-mill report of domestic violence and then someone who reports that there is also a protective order violation? What does that do to your mindset as an experienced patrol officer?

Officer Jewkes: The fact that there's a protective order in place means that a judge has already determined there's sufficient evidence to determine that the people in the house are at severe enough risk from this person that he's not even permitted to make contact with them over the telephone or any other way, let alone go to the house.

Attorney. And so when you have information that someone has done that, how does that raise your level of concern for your safety and the safety of those in the home?

Officer Jewkes: It elevates it.

**Exhibit 11**, Transcript of Preliminary Hearing, 133:10-24.[10]

72.    All officers have also testified that domestic violence and protective order calls raise concerns that a suspect will attempt to flee and return later to terrorize the family:

Attorney: [W]ith a potential fleeing suspect from a domestic violence case, maybe possible burglary, what kind of worries or concerns come into your mind based off of your experience and training?

Officer Pearce: Yeah, there's a lot of concerns.  And as a K9 handler there's additional considerations and we can walk through them. When they're trying to leave, in a domestic violence case, as I mentioned, they're trying -- oftentimes

---

[10]  This testimony is also consistent with the recent shooting of three officers and a K9 officer in Tremonton, Utah, who were all shot (some fatally) while responding to a domestic violence call.  **Exhibit 25**, KSL News Article.

they're trying to leave so they don't get arrested or they don't even have to talk to the police or whatever. But they're trying to leave. But **in my experience, it is also shown that people who try to leave oftentimes if they're not found or spoke to or investigated, oftentimes they come back. And when they come back, it has happened where when they come back -- whatever they were doing first time, when they come back the second time, it's usually substantially more dangerous. They're now really mad. They know the police have been called. It creates a very dangerous situation**.

**Exhibit 10**, Pearce Trial Testimony, 58:14-59:10.  *See also* **Exhibit 9**, Pearce Decl. ¶¶ 37-40.

> Officer Jewkes: **So the concern is if he's able to leave without us being able to apprehend him, that he could potentially return, especially in a protective order violation.**  If I am able to establish probable cause that a protective order has been violated, I am mandated by state law to make an arrest due to the high-risk factors that are involved in protective order violations.  So therefore, our concern is if he is able to flee the area and get away before we are able to apprehend him, then the situation could escalate further if he is able to return.

**Exhibit 16**, Jewkes Trial Testimony, 48:25-49:11.  *See also* **Exhibit 11**, Transcript of Preliminary Hearing, 149:12-19; **Exhibit 15**, Jewkes Decl. ¶ 42.

> Attorney: [Y]ou're aware under -- under policy it is your obligation, along with fellow police officers, to arrest Jeffrey Ryans -- . . . -- for at least violating the protective order. Right?
> Officer Orgill: That's correct. Yes.
> Attorney: **And if he's successful in fleeing, he could be a danger to his family**.
> Officer Orgill: **Correct**.

**Exhibit 18**, Orgill Trial Testimony, 51:23-52:7.

73.    In addition, all officers testified that K9s are a useful tool on these calls in the event a suspect does attempt to flee and they also encourage quick compliance with officers' orders, just by their presence and barking:

> Officer Pearce: So **police dogs, in my experience both before and after being assigned to the K9 squad, they're a very important part of simply deescalating a situation.**  A lot of times when they get out of -- when the handler gets their dog out of the truck, the dog just starts barking, and through that, you know, you might have a person who's not willing to be taken into custody. He may have even verbalized he's willing to fight with officers, but as soon as the dog shows up and

starts barking, they decide they don't want to -- they don't want to do that anymore. So **just having them there barking is often a deterrent**.

Attorney: And have you seen that?

Officer Pearce: **I have seen that many times**.

**Exhibit 10**, Pearce Trial Testimony, 22:10-25. *See also* **Exhibit 9**, Pearce Decl. ¶ 24.

Attorney: [W]ith respect to taking Mr. Ryans into custody, does the dog add anything to the situation to help make that happen?

Officer Jewkes: One thing with the dog -- there's several things that the dogs add. If he were able to, say, flee from us, dogs are able to track. So it could assist with us following and then apprehending him if he gets away from the residence. And **generally speaking, they also act as a deterrent. When people see and hear the dogs, frequently they will respond to our orders and our commands and comply with those simply out of self-preservation, not wanting to have an encounter with a -- with the dog**.

Attorney: **So a dog actually being there and barking and making their presence known, that's something that causes the vast majority of people to comply. Right?**

Officer Jewkes: **In my experience, yes**.

**Exhibit 16**, Jewkes Trial Testimony, 49:12-50:4. *See also* **Exhibit 11**, Transcript of Preliminary Hearing, 147:1-18; **Exhibit 15**, Jewkes Decl. ¶ 43.

Attorney: And based on that experience, have K9s been useful in calls that you've been out on?

Officer Orgill: Very useful.

Attorney: How?

Officer Orgill: Multiple things. They search buildings better than we can. They sniff for drugs. They're -- **they generate compliance with people. Suspects you generally encounter, see a dog, and they're complying**.

**Exhibit 18**, Orgill Trial Testimony, 32:11-18. *See also* **Exhibit 11**, Transcript of Preliminary Hearing, 81:-8-24 & 98:9-17.

74.    K9 Tuco was barking loudly and making his presence known from the time Officer Pearce first made contact with Ryans, but contrary to the officers' experience this did not cause Ryans to comply with their orders to get on the ground. **Exhibit 8**, Officer Pearce Body Cam, 7:28-8:15.

75.    The officers testified Ryans failure to do so in the presence of a K9 raised their

concerns of the degree of threat he presented to officers and others.

> Attorney: Usually in that situation, when someone can hear a dog, which there was a dog barking, no question, right?
> Officer Jewkes: Yes.
> Attorney: When they are given a command, and then they are told get on the ground, or you're going to get bit, in your many years of experience, seeing something like that, don't most people comply?
> Officer Jewkes: Most people comply.
> Attorney: And so **if someone doesn't comply, doesn't that make you even more nervous?**
> Officer Jewkes: **Yes. It makes me begin to think why are they not complying? What is the intent behind their non-compliance?**
> Attorney: **Because in the vast majority of cases in your career, a dog is on scene and people are much more compliant?**
> Attorney: **Correct.**

**Exhibit 11**, Transcript of Preliminary Hearing, 147:4-18. *See also* **Exhibit 15**, Jewkes Decl. ¶

44.

> Attorney: You even heard the threats that Mr. Ryans would get bit if he didn't get on the ground, and he still didn't get on the ground. Right?
> Officer Orgill: Yes.
> Attorney: And that was concerning to you because at the, really that moment, **you've been with K9s before. Most people comply by this time. Right?**
> Officer Orgill: **Yes. I have not encountered a situation like this where they haven't complied.**
> Attorney: **Everyone complies with a K9?**
> Officer Orgill: **Twenty-Two years, 21 and a half years, I've never had a person give -- been given commands and not comply.**
> Attorney: **So when your seeing something so just unusual, that is raising red flags, like, what, is going on. Why is he not complying.**
> Officer Orgill: **Yes.**
> Attorney: Right? And all of that was concerning to you?
> Officer Orgill: It was.

**Exhibit 18**, Orgill Trial Testimony, 56:17-57:11.[11]

---

[11] *See also* **Exhibit 18**, Orgill Trial Testimony, 28:24-29:5 & 58:6-59:1.

27

**I.** **Salt Lake City Policies and Officer Pearce and K9 Tuco's Certifications and Training.**

76.    The Salt Lake City Police Department has written policies governing use of force and the use of police canines.  **Exhibits 19 & 20**, Salt Lake City Police Dept. Policy Nos. 300 & 308.

77.    Those policies were in effect at the time of the incident.  *Id.*

78.    In the Salt Lake City Police Department, a canine team consists of one K9 and one handler.  **Exhibit 9**, Pearce Decl., ¶¶ 5-6.

79.    The handler builds a bond with the K9 and is solely responsible for their care.  The handler grooms and feeds the K9 and the K9 lives with the handler as one of the family members when not on duty.  **Exhibit 9**, Pearce Decl., ¶ 7; **Exhibit 10**, Pearce Trial Testimony, 38:9-39:10.

80.    A police K9 can perform narcotic or patrol functions.  **Exhibit 9**, Pearce Decl., ¶ 8; **Exhibit 10**, Pearce Trial Testimony, 38:9-39:10; **Exhibit 13**, Pearce Dep. 23:11-25.

81.    Narcotic functions include searching for and locating drug or illicit substances. **Exhibit 9**, Pearce Decl., ¶ 9; **Exhibit 10**, Pearce Trial Testimony, 38:9-39:10.

82.    Patrol functions include searching for missing people, kids, people that might be hiding in buildings, searching for evidence, and assisting in apprehensions.  **Exhibit 9**, Pearce Decl., ¶ 10; **Exhibit 10**, Pearce Trial Testimony, 38:9-39:10; **Exhibit 13**, Pearce Dep. 23:11-25.

83.    Handlers and K9s with the Salt Lake City Police Department must be certified in both narcotic and patrol functions, which require attending extensive training and passing examinations that are renewed annually.  **Exhibit 9**, Pearce Decl., ¶ 8; **Exhibit 10**, Pearce Trial Testimony, 39:24-44:17; **Exhibit 13**, Pearce Dep. 23:11-25.

84.    In April 2020, Officer Pearce and K9 Tuco made up a canine team.  **Exhibit 10**,

Pearce Trial Testimony; **Exhibit 13**, Pearce Decl., ¶ 12.

85.    Officer Pearce and K9 Tuco were both certified in narcotic and patrol functions on the date of the incident, having received their certification from POST, signed by its director, Wendell Nope.  **Exhibit 9**, Pearce Decl., ¶¶ 13-14; **Exhibit 10**, Pearce Trial Testimony, 39:24-44:17; **Exhibit 31**, Certificates.

86.    Officer Pearce and K9 Tuco also continued to train regularly on these functions, completing hundreds of hours of training annually.  **Exhibit 9**, Pearce Decl., ¶ 11; **Exhibit 10**, Pearce Trial Testimony, 39:24-44:17; **Exhibit 13**, Pearce Dep. 30:1-16; **Exhibit 30**, Training Sessions Time Summary.

87.    Officer Jewkes is not a K9 handler, has not trained as a K9 handler, and does not hold the required certifications.  **Exhibit 15**, Jewkes Decl. ¶ 45.

88.    He was not the handler in control of K9 Tuco on April 24, 2020.  He did not order K9 Tuco to bite, and he could not order him to release.  **Exhibit 9**, Pearce Decl. ¶ 73; **Exhibit 15**, Jewkes Decl. ¶ 45.

89.    Rather, Officer Pearce was the handler and in sole control of K9 Tuco.  **Exhibit 9**, Pearce Decl. ¶ 73.

**J.    Ryans Pled Guilty to Assault and Violation of Protective Order Charges and Officer Pearce is Exonerated of all Charged.**

90.    After the incident, Ryans and his current civil attorney met with the DA's office seeking to pursue criminal charges against Officer Pearce.  **Exhibit 27**, Recording of Trial Testimony of Ms. Gober, 2:00-4:15; **Exhibit 26**, Transcript of Ryans Interview with DA's Office.

91.    The DA Investigator did not meet with or interview Officer Pearce or any of the other officers on scene.  **Exhibit 27**, Recording of Trial Testimony of Ms. Gober, 10:20-11:15;

**Exhibit 16**, Jewkes Trial Testimony, 72:3-8.

92.     Criminal charges were initiated against Officer Pearce.   **Exhibit 32**, Amended Information.

93.     In February 2024, a jury returned a verdict of not guilty and Officer Pearce was exonerated of all charges.   **Exhibit 28**, Jury Verdict Form.

94.     Ryans entered a guilty plea for violating the protective order on the night at issue. He also pled guilty to assault of Ms. Ryans on two other occasions and several additional violations of the protective order.   **Exhibit 29**, Guilty Plea; **Exhibit 33**, Docket.

## **ARGUMENT**

### I.     **OFFICER PEARCE IS ENTITLED TO QUALIFIED IMMUNITY ON RYANS' EXCESSIVE FORCE CLAIM.**

When a defendant raises a qualified immunity defense a plaintiff must satisfy a heavy two-part burden for the claim to survive summary judgment.[12]  First, the plaintiff must show that the facts, viewed in the light most favorable to the plaintiff, show that the challenged conduct violated a constitutional right.[13]  Second, the plaintiff must demonstrate the right at issue was clearly established on the date in question.[14]  The Court may consider these two questions in either order,[15] but a failure to establish either inquiry is fatal to a plaintiff's claim.[16]

Moreover, while generally all reasonable inferences must be drawn in a plaintiff's favor,

---

[12]  *Phillips v. James*, 422 F.3d 1075, 1080 (10th Cir. 2005).

[13]  *Id.*

[14]  *Id.*

[15]  *Weise v. Casper*, 593 F.3d 1163, 1167 (10th Cir. 2010) (citing *Pearson v. Callahan*, 555 U.S. 223, 235–36 (2009)); *see also, Mocek v. City of Albuquerque*, 3 F. Supp. 3d 1002, 1052 (D.N.M. 2014) *aff'd*, 813 F.3d 912 (10th Cir. 2015) (discussing circumstances where a district court should proceed directly to clearly established prong of qualified immunity analysis).

[16]  *See, e.g., Holland v. Harrington*, 268 F.3d 1179, 1186 (10th Cir. 2001) ("If the plaintiff fails to satisfy either part of the two-part inquiry, the court must grant the defendant qualified immunity.").

"that is not true to the extent that there is clear contrary video evidence of the incident at issue."[17] Rather, the Supreme Court mandates that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court *should not* adopt that version of the facts for purposes of ruling on a motion for summary judgment."[18]  Rather, in that circumstance the Court must disregard a plaintiff's story if it amounts to a "visible fiction" and instead "view[] the facts in the light depicted by the videotape."[19]  In light of uncontradicted and indisputable record evidence, Ryans cannot satisfy his burden under either part of the two-part qualified immunity inquiry.

### A.    Ryans Cannot Show Officer Pearce's Use of Force Violated Constitutional Rights.

Ryans cannot satisfy his burden under the first prong of the qualified immunity analysis because Officer Pearce's decision to use a K9 to effect the arrest was objectively reasonable under the circumstances.  Claims that arresting or investigating officers used excessive force against a person during a search or seizure are analyzed under the Fourth Amendment and its "relatively exacting 'objective reasonableness' standard."[20]  Determining if an officer's actions were objectively reasonable, in a given set of facts, "is a pure question of law" for the Court to resolve.[21]

---

[17] *Thomas v. Durastanti*, 607 F.3d 655, 659 (10th Cir. 2010).

[18] *Scott v. Harris*, 550 U.S. 372, 380 (2007) (emphasis added); *see also, Rowell v. Bd. of Comm'rs. of Muskogee Cty.*, 978 F.3d 1165, 1171 (10th Cir. 2020) ("[W]e cannot ignore clear, contrary video evidence in the record depicting the events as they occurred."); *Estate of Valverde v. Dodge*, 967 F.3d 1049, 1055 (10th Cir. 2020) ("To the extent that the synchronized video unmistakably establishes facts, we are to apply them, even if they are contrary to other evidence, such as testimony.").

[19] *Scott*, 550 U.S. at 381.

[20] *Porro v. Barnes*, 624 F.3d 1322, 1325 (10th Cir. 2010); *see also, Graham v. Connor*, 490 U.S. 386, 396 (1989).

[21] *Scott*, 550 U.S. at 381 n.8 ("At the summary judgment stage . . . once we have determined the relevant set of facts and drawn all inferences in favor of the nonmoving party to the extent supportable by the record . . . the reasonableness of [an officer's] actions . . . is a pure question of law."); *see also, Mecham v. Frazier*, 500 F.3d 1200, 1203 (10th Cir. 2007) ("The question of objective reasonableness is not for the

The inquiry is both "holistic—considering the totality of the circumstances—and objective, disregarding officers' subjective 'underlying intent or motivation.'"[22]  Three criteria, often referred to as the *Graham* factors, guide the objective reasonableness inquiry: 1) "the alleged crime's severity" 2) "the degree of potential threat that the suspect poses to an officer's safety and to others' safety,"[23] and 3) "the suspects efforts to resist or evade arrest."[24]  "There is no requirement that all of these criteria be satisfied before a use of force can be objectively reasonable."[25]  Rather, satisfaction of only one factor can be sufficient.[26]

The inquiry must also be "undertaken from 'the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight,'"[27] and consideration must be given to the fact that "the officer may be 'forced to make split-second judgments' under stressful and dangerous conditions."[28]  For this reason, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment."[29]  Similarly, "[i]f an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, for instance, the officer would be justified in using more force than in fact was needed."[30]

Applying this standard to the particular facts and circumstances of this case indisputably

---

jury to decide where the facts are uncontroverted.").

[22]  *Couser v. Somers*, No. 23-3041, 2024 WL 1006794, at *4 (10th Cir. Mar. 8, 2024) (internal citations omitted).

[23]  The Tenth Circuit has directed that where a use of deadly force is at issue, this second inquiry changes to whether the suspect posed an "immediate threat to police officers or civilians." *Marquez v. City of Albuquerque*, 399 F.3d 1216, 1220, n.1 (10th Cir. 2005).

[24]  *Graham*, 490 U.S. at 396.

[25]  *Gutierrez v. Hackett,* 131 Fed. Appx. 621, 624 (10th Cir. 2005).

[26]  *See, e.g., Hinton v. City of Elwood*, 997 F.2d 774, 781 (10th Cir. 1993) (finding first two *Graham* factors not satisfied, but third strongly supported a finding that use of force objectively reasonable).

[27]  *Id.* (quoting *Graham*, 490 U.S. at 396).

[28]  *Gross v. Pirtle*, 245 F.3d 1151, 1158 (10th Cir. 2001) (quoting *Graham*, 490 U.S. at 396).

[29]  *Id.*

[30]  *Saucier v. Katz*, 533 U.S. 194, 205 (2001).

shows Officer Pearce's use of a K9 to arrest Ryans was objectively reasonable and no constitutional violation is shown.

### 1.    The Severity of the Crimes Weigh in Favor of the Use of Force.

The first *Graham* factor—the severity of the alleged crimes—weighs in favor of Officer Pearce.  Where a suspect is being investigated for a felony, this factor weighs against a plaintiff and in favor of an officer's use of force, regardless of whether the felony is violent or non-violent or whether the suspect is ultimately charged or convicted of a felony crime.[31]  Similarly, the Tenth Circuit recognizes violent misdemeanors warrant more force than non-violent misdemeanors.[32]  Applying this principle, an Oklahoma Federal District Court found the severity of crime factor weighed in favor of the officer because he was responding to a complaint of domestic violence, which could be charged as both a misdemeanor and a felony, and the officer had been informed the suspect was drunk, his wife had markings on her face, and a medical unit had been dispatched.[33]

Here, Ryans was suspected of committing multiple crimes and crimes of violence, including burglary, assault, and violation of a protective order.  Specifically, "[a]n actor is guilty of burglary" when they "enter[ ] or remain unlawfully in a building or any portion of a building

---

[31]  *See, e.g., Andersen v. DelCore*, 79 F.4th 1153, 1164 (10th Cir. 2023) (holding severity of crime weighed in favor of use of force because suspect was being investigated for felony child abuse, although he was ultimately charged with a misdemeanor of obstructing justice); *Mazoch v. Carrizales*, 733 F. App'x 179, 182 (5th Cir. 2018) ("When assessing the severity of the crime, we must consider actions that a reasonable officer could perceive to be a crime regardless of whether those actions were later the basis for a prosecution"); *Palacios v. Fortuna*, 61 F.4th 1248, 1256 (10th Cir. 2023) ("When the crime at issue is a felony, regardless of whether the felony is violent or nonviolent, the crime is considered to have a high degree of severity which weighs against the plaintiff.").

[32]  *Ibarra v. Lee*, No. 22-5094, 2023 WL 6939236, at *10 (10th Cir. Oct. 20, 2023) ("A felony or violent conduct justifies more force.").

[33]  *Walker v. Anderson*, No. 23-CV-0008-CVE-JFJ, 2024 WL 3905733, at *7 (N.D. Okla. Aug. 22, 2024).

with intent to commit a felony" or "assault on a person."[34]  When the building is a dwelling it is prosecuted as a second degree felony.[35]  Here, it is undisputed Ryans was at 765 Justin Kay Court in violation of a protective order, i.e., he was unlawfully at a dwelling.  Officer Pearce was also provided information that several assaults or attempted assaults had occurred, including an assault on Mrs. Ryans and an attempt to enter a room where occupants of the home (including minors) were hiding.[36]

In addition to the suspected felony burglary, domestic violence and violation of protective orders are considered serious crimes in Utah.  They are prosecuted as a Misdemeanor A—the most serious type of misdemeanor offense—and are subject to felony enhancement.[37]  Moreover, unlike most Misdemeanor A violations, protective order violations result in immediate and mandatory arrest with no discretion to issue a citation in lieu of transportation to jail.[38]  Ryans pled guilty to this charge.[39]  This factor weighs in favor of the reasonableness of Officer Pearce's use of force.

2.  <u>It was Objectively Reasonable for Officer Pearce to Believe Ryans Posed a Threat to the Safety of the Officers and Others.</u>

The second *Graham* factor also weighs in favor of the reasonableness of the use of force.  This factor considers "the degree of potential threat that the suspect poses to an officer's safety and to others' safety."[40]  Myriad facts can inform this inquiry, including the suspected crime, the time of day, if it is a residential neighborhood, the suspect's prior conduct, a failure to comply with

---

[34] Utah Code § 76-6-202; Utah Code § 76-5-108.
[35] *Id.*
[36] *See, e.g.*, **Exhibit 7**, Radio Dispatch, 0:00-3:00.
[37] Utah Code § 76-5-108(3).
[38] *Compare* Utah Code § 77-36-2.4 (requiring mandatory arrest for violation of a protective order), *with* Utah Code § 77-7-18 (providing discretion to issue citation for other misdemeanor charges in lieu of arrest).
[39] *See* **Exhibit 29**, Guilty Plea.
[40] *Marquez*, 399 F.3d at 1220.

instructions, verbal resistance, or erratic, unpredictable or unexplainable behavior.[41]  For example, in *Zuress v. City of Newark*, the Sixth Circuit found the second *Graham* factor weighed in favor of the use of a police canine to apprehend plaintiff at a traffic stop because she had "just traveled from a known drug house," her companion was a known drug addict, he was "under surveillance because there was an outstanding warrant out on him (albeit for unpaid child support)" and "perhaps most importantly, plaintiff was not complying with the officers' commands; she was arguing, waving her hands around, turning to face the officers, and even reached for her waistband where a weapon could have been."[42]

Moreover, in assessing this factor, "officers are not required to be correct in their assessment of the danger presented by the situation, only that their assessment be objectively reasonable."[43]  In other words, "[i]f an officer reasonably, but mistakenly, believed that a suspect was likely to fight back[,] . . . the officer would be justified in using more force than in fact was

---

[41] *See, e.g., Moya v. City of Clovis*, No. CV 18-494 GBW/KRS, 2019 WL 6255217, at *5 (D.N.M. Nov. 22, 2019), aff'd, 829 F. App'x 346 (10th Cir. 2020) ("Relevant facts for assessing the threat posed by the suspect include the nature of the crime involved (*i.e.*, whether it was violent.)"); *Thomson v. Salt Lake County*, 584 F.3d 1304, 1317 (10th Cir. 2009) (Finding use of police dog objectively reasonable where suspect fled domestic violence scene into a residential neighborhood in the middle of the night.); *Jarrett v. Town of Yarmouth*, 331 F.3d 140, 150 (1st Cir. 2003) (holding use of dog to apprehend plaintiff for minor traffic infractions was reasonable because the officer could "reasonably have concluded" plaintiff "posed a threat to the safety of residents when he fled the scene of a vehicle accident on foot "into a residential neighborhood"); *In re Est. of Bleck ex rel. Churchill*, 643 F. App'x 754, 756 (10th Cir. 2016) (rejecting plaintiff's argument that force used was excessive because there was no indication plaintiff intended to flee or harm anyone but himself because court could not ignore other facts that showed the officers reasonably believed plaintiff was intoxicated, volatile, and very possibly armed); *Escobar v. Montee*, 895 F.3d 387, 394 (5th Cir. 2018) (finding "a reasonable officer could believe [plaintiff's] surrender was a ploy" and that he still posed a threat where he led officers on a chase at night through a residential neighborhoods, his mother warned he would not go without a fight, and the knife he had dropped remained within reach).

[42] *Zuress v. City of Newark*, 815 F. App'x 1, 5 (6th Cir. 2020).

[43] *Est. of Turnbow v. Ogden City*, 386 F. App'x 749, 753 (10th Cir. 2010) (citing *Jiron*, 392 F.3d at 415); *see also, Palacios*, 61 F.4th at 1262 ("An officer's belief need not be correct, so long as it is reasonable.").

needed."[44]  Indeed, the Tenth Circuit has repeatedly stated a "reasonable officer need not await the 'glint of steel' before taking self-protective action; by then, it is often . . . too late to take safety precautions."[45]  Likewise, "the presence or absence of a warning is a critical fact in virtually every excessive force case involving a police dog" and can be dispositive of the reasonableness of the use of force in the absence of an imminent threat.[46]

Here, it is indisputable that Ryans was warned at least four times that his continued failure to comply with orders to get on the ground would result in use of the canine.[47]  Ryans, inexplicably, failed to comply.[48]  Indeed, by the time K9 Tuco was ordered to bite, Ryans had failed to comply with at least ten orders to get on the ground from three different officers over the space of a couple of minutes.[49]  Ryans also failed to comply with orders to provide his name, which had to be given by another officer who knew him from a prior encounter, and it required four orders to get him to comply with orders to come to the front fence.[50]  All three officers testified that in their decades of experience suspects comply quickly with these types of police orders, especially in the presence

---

[44]  *Jiron v. City of Lakewood*, 392 F.3d 410, 415 (10th Cir. 2004) (quoting *Saucier*, 533 U.S. at 205).

[45]  *Est. of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008); *see also, Palacios*, 61 F.4th at 1262 ("officers are not required to 'await the glint of steel' before taking protective action."); *Est. of Alire by Alire v. Wihera*, No. 23-1213, 2024 WL 5183300, at *5 (10th Cir. Dec. 20, 2024) ("our refrain has been a 'reasonable officer need not await the glint of steel before taking self-protective action.'").

[46]  *See, e.g., Moya*, 2019 WL 6255217, at *5 ("An overarching consideration in these cases is whether officers gave a verbal warning before releasing the dog."); *Marquez*, 399 F.3d at 1221 (finding that a jury could reasonably conclude that the officer "acted reasonably when, after warning [the plaintiff] to halt, he ordered his police service dog to apprehend [the plaintiff]"); *Matthews v. Jones*, 35 F.3d 1046, 1051 (6th Cir. 1994) (finding no excessive force as a matter of law where the record was clear that the officer warned plaintiff, a fleeing misdemeanant, several times before releasing the police dog to apprehend him).

[47]  **Exhibit 8**, Pearce Body Cam, 7:28-8:58, **Exhibit 14**, Jewkes Body Cam, 5:45-7:17; **Exhibit 17**, Orgill Body Cam, 5:15-6:50.

[48]  *Id.*

[49]  *Id.*

[50]  *Id.*

of a police canine.[51]  When they do not it is a strong indicator that they plan to fight or flee.[52]

In addition to failing to comply with repeated orders to get on the ground, Ryans actively resisted Officer Pearce's attempt to take him to the ground.  Specifically, when Officer Pearce delivered a boot strike to his left thigh in an attempt to get Ryans to comply and avoid use of K9 Tuco, Ryans did not comply and get on the ground.  To the contrary, Ryans dropped to one knee, grabbed the fence with an overhand grip, and turned his upper body to face Officer Pearce, as if to challenge him.[53]  From this position Ryans could resist additional physical efforts to take him to the ground.[54]  It is also very easy to stand back up from this position, which further raised Officer Pearce's concern that Ryans posed an immediate threat.[55]

The nature of the call and the information Officer Pearce was provided also indicated Ryans presented an imminent threat.  It was 2:00 a.m. and the officers were responding to a call from a terrified fifteen-year-old girl who reported her father was at their home in violation of a protective order and had physically assaulted her mother.[56]  Officer Pearce was also provided information that Ryans had attempted to enter a room that the minor caller or her mother were hiding in, and that the caller's minor brother prevented that from happening.[57]  All officers also testified that in addition to the threat that Ryans posed to the family members in that moment, in their experience

---

[51] *See, e.g.*, **Exhibit 10**, Pearce Trial Testimony, 22:10-25; **Exhibit 9**, Pearce Decl. ¶ 24; **Exhibit 16**, Jewkes Trial Testimony, 49:12-50:4; **Exhibit 15**, Jewkes Decl. ¶¶ 43-44; **Exhibit 18**, Orgill Trial Testimony, 28:24-29:5, 32:11-18, 56:13-57:11 & 58:6-59:1; **Exhibit 11**, Transcript of Preliminary Hearing, 81:-8-24, 98:9-17, 147:1-18.

[52] *Id.*

[53] **Exhibit 8**, Pearce Body Cam 8:55-58; **Exhibit 14**, Jewkes Body Cam, 7:12-15; **Exhibit 9**, Pearce Decl. ¶ 63; **Exhibit 10**, Pearce Trial Testimony, 111:18-112:15.

[54] *Id.*

[55] **Exhibit 9**, Pearce Decl. ¶ 64; **Exhibit 10**, Pearce Trial Testimony, 112:16-22; **Exhibit 13**, Pearce Dep. 153:25-154:9; **Exhibit 15**, Jewkes Decl. ¶ 33; **Exhibit 16**, Jewkes Trial Testimony, 69:6-12.

[56] **Exhibit 5**, 911 Call; **Exhibit 7**, Radio Dispatch; **Exhibit 6**, CAD Call.

[57] *Id.*

there is a significant risk that suspects of domestic violence crimes or violation of protective orders will return to the property later to terrorize the family, if not arrested and taken into custody.[58] And the return visit is exponentially more dangerous because now the suspect is even more upset because police were called.[59]

Finally, officers had not yet had the opportunity to search Ryans for any weapons.[60] Based on all these facts, it was objectively reasonable for Officer Pearce to believe Ryans posed a threat to both the safety of officers and others, and it was reasonable to use K9 Tuco to quickly and efficiently secure Ryans in handcuffs.

> 3. It was Objectively Reasonable for Officer Pearce to Believe Ryans Attempted to Resist or Evade Arrest.

The third *Graham* factor—which considers "the suspect's efforts to resist or evade arrest"[61]—also weighs heavily in favor of Officer Pearce. The Tenth Circuit has frequently held that the use of force to effect an arrest does not violate Fourth Amendment rights where the suspect is actively fleeing or attempting to flee a scene.[62] Moreover, a suspect's prior attempt to flee is relevant to the totality of the circumstances and is evidence from which a court can conclude the use of force was reasonable.[63] Here, Ryans did not respond to officers when they arrived at the

---

[58] *See e.g.*, **Exhibit 9**, Pearce Decl. ¶¶ 37-40; **Exhibit 10**, Pearce Trial Testimony, 14:1-6 & 58:14-59:10; **Exhibit 15**, Jewkes Decl. ¶ 42; **Exhibit 16**, Jewkes Trial Testimony, 48:25-49:11; **Exhibit 18**, Orgill Trial Testimony, 51:23-52:7; **Exhibit 11**, Transcript of Preliminary Hearing, 133:10-24 & 149:12-19.

[59] *Id.*

[60] **Exhibit 8**, Pearce Body Cam, 7:28-8:58, **Exhibit 14**, Jewkes Body Cam, 5:45-7:17; **Exhibit 17**, Orgill Body Cam, 5:15-6:50.

[61] *Marquez*, 399 F.3d at 1220.

[62] *See, e.g., Thomson*, 584 F.3d at 1317 (holding use of K9 to locate suspect that fled into residential neighborhood after assaulting wife did not violate suspect's constitutional rights).

[63] *Moya*, 829 Fed. Appx. at *348-50 (holding attempting flight immediately prior to K9 deployment relevant to the totality of the circumstances and the reasonableness of the Officer's decision to use a K9).

property and called for him to come out from the basement.[64]  Officer Pearce then located him in

the backyard, by the back wall, with a pile of clothes, and a brick set on its end like a step.[65]  A

previously dark and closed side window (just feet from where Ryans was located) was now open,

with a light on, and the curtains were flapping outside.[66]  It was objectively reasonable from these

undisputed facts for Officer Pearce to conclude Ryans had exited the property via the window and

was attempting to resist or evade arrest by fleeing over the back wall.

       In addition to attempts to actively flee, the Tenth Circuit has held a failure to follow lawful

commands is a form of resisting or evading arrest that justifies the use of intermediate force (like

the use of a canine) to effect an arrest.[67]  This is especially true where—as here—a suspect is

warned that continued failure to comply with commands will result in use of a canine.  For

example, in *Mecham v. Frazier*, the Tenth Circuit held an officer's use of pepper spray did not

violate Fourth Amendment rights in light of the female plaintiff's "resistance to arrest," which

included not following repeat instructions to leave her vehicle to allow the officers to tow it, after

being stopped for driving on a suspended license.[68]  Similarly, in *Zuress v. City of Newark*, the

Sixth Circuit held use of a canine to bite and hold a female suspect subject to a traffic stop was

objectively reasonable where the female failed to follow repeated instructions to turn away from

officers and walk back towards them.[69]  In analyzing the third *Graham* factor, the Court held it

---

[64] **Exhibit 8**, Pearce Body Cam, 6:30-7:15; **Exhibit 17**, Orgill Body Cam, 2:25-5:10.

[65] **Exhibit 8**, Pearce Body Camera, 7:15-7:28; **Exhibit 9**, Pearce Decl. ¶¶ 44-48; **Exhibit 10**, Pearce Trial Testimony, 85:9-87:8 & 87:18-88:22; **Exhibit 22**, Crime Scene Photo.

[66] *Id.*

[67] *See, e.g., Mecham*, 500 F.3d at 1204-05.

[68] *Id.  See also, Hinton*, 997 F.2d at 781-82 (holding use of a taser was objectively reasonable where the suspect failed to comply with orders to stop and talk with officers, which ended in a physical altercation).

[69] *Zuress*, 815 F. App'x 1, at **4-6.

weighed in favor of the use of force because plaintiff was actively resisting arrest by arguing with officers and she "repeatedly failed to follow commands."[70]  Finally, in *Gutierrez v. Hackett*, the Tenth Circuit found there were facts to support a defense verdict where a canine was used to apprehend a man that ignored repeated instructions to leave a vehicle he broke in to.[71]

Just like the plaintiffs in *Mecham, Zuress*, and *Gutierrez*, Ryans repeatedly failed to follow clear orders to get on the ground, which were accompanied by repeated warning that continued failure to follow these instructions would result in use of a K9.[72]  In sum, it was objectively reasonable for Officer Pearce to believe Ryans had attempted to evade the officers by flight and (once located in the backyard) that he was resisting arrest by repeatedly failing to follow commands to get on the ground.  Officer Pearce's use of K9 Tuco to effect the arrest was objectively reasonable and no constitutional violation is shown.

4.    The Bite did not Extend Longer Than Necessary to Secure Ryans in Handcuffs.

Ryans' alternative claim—that the force used was excessive because the bite lasted longer than necessary—also fails.  "There is no exact duration that is considered reasonable, but dog bites lasting less than a minute are often found objectively reasonable while dog bites continuing for one or more minutes are often found objectively unreasonable."[73]  Similarly, federal courts have upheld canine deployments, and rejected arguments that they lasted longer than necessary, where the dog is released once the suspect is secured in handcuffs.  For example, in *Moya*, the Tenth

---

[70] *Id.*
[71] *Gutierrez*, 131 F. App'x at 624-25.
[72] **Exhibit 8**, Pearce Body Cam, 7:28-8:58; **Exhibit 14**, Jewkes Body Cam, 5:45-7:17; **Exhibit 17**, Orgill Body Cam, 5:15-6:50.
[73] *Moya v. City of Clovis*, No. CV 18-494 GBW/KRS, 2019 WL 6255217, at *6.

Circuit held it was reasonable for the officer to wait until other officers arrived to handcuff the suspect before releasing his K9 from the bite, specifically noting the officer ended the bite "immediately upon [the plaintiff's] handcuffing" and that it was "reasonable for [the officer] to wait until other officers were able to handcuff [plaintiff] before commanding [the K9] to let go.[74] Similarly, in *Johnson*, the Seventh Circuit held the force was not excessive where the K9 was ordered to stop biting "five or ten seconds" *after* the suspect was secured in handcuffs.[75] Similarly, in *Miller*, the Court held a bite lasting 45–60 seconds until deputy could arrive on scene and secure the suspect in handcuffs was reasonable.[76] Here, it is undisputed the bite lasted less than a minute and Officer Pearce released K9 Tuco from the bite the instant he received verbal confirmation from Officer Jewkes that Ryans was in handcuffs and this claim also fails.[77]

### B.    Officer Pearce's Use of Force did not Violate Clearly Established Law.

Ryans also cannot satisfy his burden under the second prong of the qualified immunity analysis and show Officer Pearce's use of a K9 to effect the arrest violated a clearly established constitutional right.[78] "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'"[79] "Clearly

---

[74] *Moya*, 829 Fed App'x at 349.

[75] *Johnson v. Scott*, 576 F.3d 658, 660-61 (7th Cir. 2009).

[76] *Miller v. Clark County*, 340 F.3d 959, 960-61 & 963–69 (9th Cir. 2003); *see also, Mendoza v. Block*, 27 F.3d 1357, 1362 (9th Cir. 1994) (holding it is constitutional to use a dog to "secure [a suspect] until he stopped struggling and was handcuffed").

[77] **Exhibit 8**, Pearce Body Cam 8:58-9:42 (showing 44 seconds from the command "hit" to the command "aus"); **Exhibit 14**, Jewkes Body Cam, 7:17-8:01 (same).

[78] *See, e.g., Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001) (stating plaintiff has the burden of demonstrating "the right at issue was clearly established at the time of the defendants' [claimed] unlawful conduct").

[79] *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)) (alteration in original).

established" does "not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."[80]  In *White v. Pauly*, the Supreme Court provided guidance on the appropriate level of specificity a district court should adopt in deciding whether a right is clearly established.[81]  It rejects applying general propositions such as "the right to be free from unreasonable seizure," directing courts to narrowly define the right with appropriate facts:

> In the last five years, this Court has issued a number of opinions reversing federal courts in qualified immunity cases. The Court has found this necessary both because qualified immunity is important to "society as a whole," and because as "an immunity from suit," qualified immunity "is effectively lost if a case is erroneously permitted to go to trial,"
>
> Today, it is again necessary to reiterate the longstanding principle that "clearly established law" should not be defined "at a high level of generality." As this Court explained decades ago, the clearly established law must be "particularized" to the facts of the case. Otherwise, "[p]laintiffs would be able to convert the rule of qualified immunity ... into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights."[82]

Applying this direction, the Tenth Circuit recently held that this "[s]pecificity is particularly important in Fourth Amendment excessive force cases" and that plaintiffs can only "overcome qualified immunity in this context [ ] when existing prior precedent 'squarely governs' the specific facts at issue."[83]  In other words, "[t]he rule's contours must be so well defined that it is clear to a reasonable officer [the defendant officers'] conduct was unlawful in the situation [the defendant officers'] confronted."[84]  No such precedent exists.

---

[80] *Id.*
[81] *White v. Pauly*, 137 S. Ct. 548 (2017).
[82] *Id.* at 551-52 (internal citations omitted).
[83] *Est. of Alire*, 2024 WL 5183300, at *3.
[84] *Id.*

To the contrary, just a year before the event at issue in this case, the Tenth Circuit issued its decision in *Crall v. Wilson*.[85]  It held plaintiff had failed to meet his burden to "identify any precedent with a similar fact pattern" that would put a reasonable officer on notice that deploying a police canine violated constitutional rights when officers announced their presence, ordered plaintiff to exit the bedroom, and warned the canine would be deployed if he failed to do so.[86] Exercising its discretion to consider only the second prong of the qualified immunity analysis, the Tenth Circuit explained the officer reasonably could have believed use of a police dog in this circumstance was permissible because the Tenth Circuit held in *Marquez* that a "jury could rationally reach the conclusion that [law enforcement] . . . acted reasonably when, after warning [plaintiff] to halt, he ordered his police service dog to apprehend [plaintiff]."[87]  The same analysis applies here.  Officer Pearce reasonably could have believed deploying K9 Tuco was constitutional because the officers announced their presence, Ryans did not follow repeated orders to get on the ground, and he was warned four times that his failure to comply would result in being bitten. Ryans cannot satisfy the second prong of the qualified immunity analysis and the Court may enter judgment for Officer Pearce on this separate and independent ground.

## II.    OFFICER JEWKES IS ENTITLED TO QUALIFIED IMMUNITY ON RYANS' FAILURE TO INTERVENE CLAIM.

### A.    Ryans Cannot Show a Violation of Constitutional Rights.

Ryans sole claim against Officer Jewkes is that he failed to intervene to prevent Officer Pearce from ordering K9 Tuco to bite.  This claim fails for two separate and independent reasons.

---

[85] *Crall v. Wilson,* 769 Fed. Appx. 573 (10th Cir. 2019).
[86] *Id.* at 574-75 & 577.
[87] *Id.* at 577.

First, as set forth above, Ryans cannot show Officer Pearce's use of K9 Tuco violated his constitutional rights.  Where the force at issue does not violate constitutional rights, there can be no claim for a failure to intervene.[88]

Second, Ryans cannot establish essential elements of a failure to intervene claim.  An officer is not liable merely because he was present at the scene of a claimed constitutional violation.[89]  Rather, a plaintiff must show the officer had "a realistic opportunity to intervene to prevent harm from occurring."[90]  In *Savannah*, the Tenth Circuit dismissed plaintiff's failure to intervene claim, holding that "although [plaintiff] asserts [the officer] should have stopped [the K9], he does not assert the [officer] could have stopped [the K9]."[91]  [The Officer] did not deploy [the K9] and there is no assertion that he had the ability to control the dog."[92]  The Court further found that plaintiff did not "assert facts suggesting [the officer] had sufficient time to intervene."[93]  Ryans likewise has no facts to show Officer Jewkes had a realistic opportunity to intervene.  Officer Jewkes is not a K9 handler, has not trained as a K9 handler, and does not hold the required certifications.[94]  He was not the handler in control of K9 Tuco on April 24, 2020.[95]  He did not order K9 Tuco to bite, and he could not order him to release.[96]  Rather, Officer Pearce was the handler and in sole control of K9 Tuco.[97]  There is also no evidence that there was realistic time

---

[88] *Jones v. Norton*, 3 F. Supp. 3d 1170, 1197 (D. Utah 2014), aff'd, 809 F.3d 564 (10th Cir. 2015) ("there can be no failure to intervene if a constitutional right has not been violated.").

[89] *See, e.g., Savannah v. Collins*, 547 F. App'x 874, 876 (10th Cir. 2013).

[90] *Id.*

[91] *Id.*

[92] *Id.*

[93] *Id.* at 877.

[94] **Exhibit 15**, Jewkes Decl. ¶ 45.

[95] **Exhibit 15**, Jewkes Decl. ¶ 45; **Exhibit 9**, Pearce Decl. ¶ 73.

[96] *Id.*

[97] **Exhibit 9**, Pearce Decl. ¶ 73.

to intervene.  To the contrary, Officer Jewkes was responsible for securing Ryans in handcuffs and the dog was released as soon as that was accomplished.[98]  No constitutional violation is shown and this claim should also be dismissed.

### B.    Ryans Cannot Show the Right Was Clearly Established.

Ryans also cannot satisfy his burden under the second prong of the qualified immunity analysis and show Officer Jewkes' alleged failure to intervene violated a clearly established constitutional right.  Specifically, Ryans cannot identify Supreme Court or Tenth Circuit precedent with sufficiently similar facts that would put Officer Jewkes on notice that his conduct violated constitutional rights.  To the contrary, the Tenth Circuit's decision in *Savannah* demonstrates the opposite.  It holds an officer in a similar position to Officer Jewkes, i.e., an officer in no position to control a K9, did not violate constitutional rights by not preventing another officer from causing a K9 to bite.[99]  The claim against Officer Jewkes should be dismissed on this ground also.

## III.    SALT LAKE CITY IS ENTITLED TO ENTRY OF JUDGMENT ON RYANS' *MONELL* CLAIM.

### A.    No Constitutional Violation is Shown.

Defendant Salt Lake City is entitled to judgment on Ryans' section 1983 claims against the City—often referred to as *Monell* claims—because Ryans cannot show the force used by the officers violated his Fourth Amendment rights.  "[A] municipality may not be held liable where there [is] no underlying constitutional violation by any of its officers."[100]  Because the officers'

---

[98]  **Exhibit 8**, Pearce Body Cam 8:58-9:42 (showing 44 seconds from the command "hit" to the command "aus"); **Exhibit 14**, Jewkes Body Cam, 7:17-8:01 (same).
[99]  *Savannah*, 547 F. App'x at 876.
[100]  *Hinton*, 997 F.2d at 782 (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)); *see also, Jiron*, 392 F.3d at 419, n.8.

conduct did not violate Ryans' Fourth Amendment rights, Ryans' *Monell* claims necessarily fail.

**B.    The Elements of *Monell* Liability are also not Met.**

Ryans' *Monell* claims fail for the separate and independent reason that, notwithstanding Ryans failure to establish a violation of constitutional rights, he cannot satisfy the additional elements required to establish a section 1983 claim against a government entity.  Specifically, the Supreme Court has made clear that "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents."[101]  "[I]n other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory."[102]  Rather, a government entity may only be held liable when "execution of a government's policy or custom" caused plaintiff's injury.[103]

The Tenth Circuit has identified a "rigorous" three-part test a plaintiff must satisfy to prove a *Monell* claim.[104]  First, a plaintiff must identify an official policy or custom.[105]  This element is "intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible."[106]  A policy or custom can take one of five recognized forms, which include "a formal regulation or policy statement," "an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law," and a "failure to adequately train

---

[101] *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).
[102] *Id.* at 691.
[103] *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 770 (10th Cir. 2013); *see also, Waller v. City & County of Denver*, 932 F.3d 1277, 1284 (10th Cir. 2019).
[104] *Schneider*, 717 F.3d at 769.
[105] *Id.* at 769-70.
[106] *Id.* at 770.

or supervise employees, so long as that failure results from 'deliberate indifference' to the injuries that may be caused."[107]

Second, a plaintiff must establish the identified policy or custom was the "moving force" behind the constitutional violation.[108]  This requires a showing of "a direct causal link between the [challenged] policy or custom and the injury alleged."[109]  This element is applied with "especial rigor" when "the municipal liability claim is based upon inadequate training [or] supervision."[110]

Third a plaintiff must establish the claimed municipal action was taken with "deliberate indifference."[111]  This is a "stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action."[112]

Ryans' Complaint asserts three separate section 1983 claims against Salt Lake City—none of which satisfy this rigorous three-part test.

        1.      <u>Ryans Cannot Establish Essential Elements of his Third Claim for Relief.</u>

Ryans' Third Claim for Relief contends the City had a "policy, practice or custom" of maintaining a canine apprehension program that did not "require officers to use less destructive and dangerous alternatives prior to deploying dogs against civilians, and without providing proper training and/or supervision regarding their safe, reasonable, and appropriate use."[113]  Ryans cannot satisfy his burden to show this claimed municipal policy was the "direct cause" of a constitutional violation.  It is well-established that "the Fourth Amendment does not require [police] to use the

---

[107] *Waller,* 932 F.3d at 1284.
[108] *Schneider,* 717 F.3d at 770.
[109] *Id.*
[110] *Id.*
[111] *Id.*
[112] *Connick v. Thompson,* 563 U.S. 51, 61 (2011).
[113] Dkt. #2, Compl. ¶ 67.

least intrusive means in the course of a detention, only reasonable ones."[114]  As such, failing to impose a policy, practice or custom that requires more than the Constitution cannot be the "direct cause" of a constitutional violation.  Similarly, Ryans cannot satisfy his additional burden to show the City was deliberately indifferent to the "known and obvious consequences" of its actions because a constitutional violation is not the "known and obvious consequences" of failing to adopt a policy, practice or custom that exceeds constitutional requirements.

To the extent the Third Claim for Relief asserts a claim for a failure to train or supervise regarding the "safe, reasonable, and appropriate use" of canines that is separate and distinct from failing to require use of lesser force, that claim also fails.[115]  To make a claim under a failure to train or supervise theory, Ryans must identify specifically what about the City's training was "inadequate."[116]  For example, in *Brown v. Whitman*, the Colorado Federal District Court rejected plaintiff's failure to train claim because the undisputed evidence showed that the handler and K9 had obtained all required certifications and that they completed hundreds of hours of maintenance training annually.[117]  Just like the officer and K9 in *Brown*, it is undisputed that Officer Pearce and K9 Tuco held all required certifications and completed hundreds of hours of maintenance training annually.[118]  As such, Ryans cannot satisfy his threshold burden to show the training was "inadequate."

Ryans also cannot satisfy his burden to show the training was a direct cause of the claimed

---

[114] *Fisher v. City of Las Cruces*, 584 F.3d 888, 894 (10th Cir. 2009).
[115] Dkt. #2, Compl. ¶ 67.
[116] *Brown v. Gray*, 227 F.3d 1278, 1286 (10th Cir. 2000).
[117] *Brown v. Whitman*, 651 F. Supp. 2d 1216, 1231-32 (D. Colo. 2009).
[118] **Exhibit 9**, Pearce Decl., ¶¶ 11 & 13-14; **Exhibit 10**, Pearce Trial Testimony, 39:24-44:17; **Exhibit 13**, Pearce Dep. 30:1-16; **Exhibit 31**, Certificates; **Exhibit 30**, Training Sessions Time Summary.

constitutional violation—because no inadequate training has been identified—or his final burden to show the City was deliberately indifferent.  To establish deliberate indifference in failure to train claims, the Tenth Circuit requires evidence the municipality had actual or constructive notice of the particular deficiency claimed.[119]  This is because, "[w]ithout notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights."[120]  Ordinarily evidence of "[a] pattern of similar constitutional violations by untrained employees" is required to satisfy this burden.[121]

Here, there is no such evidence.  Rather, Ryans' Complaint makes general allegations that the City referred cases to the District Attorney's Office for review *after* the incident at issue in this case.[122]  First, evidence the City referred cases to the District Attorney's Office for review is inadmissible under Rule 407 of the Federal Rules of Evidence: "When measures are taken that would have made an earlier injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove negligence [or] cuplable conduct."[123]  Second, even if admissible, the fact the City referred cases to the District Attorney's Office for review is not evidence that any of the bites in fact violated constitutional rights.  To the contrary, the District Attorney's Office did not take any action on any of the referred bites, with the exception of the unsuccessful attempt to prosecute Officer Pearce for the incident at issue in this case and one other

---

[119] *Waller*, 932 F.3d at 1284.
[120] *Connick*, 563 U.S. at 62.
[121] *Waller*, 932 F.3d at 1285.
[122] Dkt. #2, Compl. ¶¶ 78-79.
[123] Fed. R. Evid. 407.

incident—a charge the State voluntarily dismissed citing evidentiary issues.[124]  Third, there is no evidence any of the individuals involved in the referred cases submitted a claim or otherwise complained to the City about the officer's conduct prior to the incident at issue in this case.  As such, the City could not have been on actual or constructive notice of any alleged deficiency in its training.  For all these reasons, judgment should enter for the City on Ryans' Third Claim for Relief.

       2.      <u>Ryans Cannot Establish Essential Elements of his Fourth Claim for Relief.</u>

Ryans' Fourth Claim for Relief alleges the City had a "policy, practice or custom" of "diverting use of force reports" relating to canine use "away from the review process."[125]  Ryans contends "this was accomplished" by an unnamed "sergeant and lieutenant in charge of receiving reports of police dog attacks, intentionally withholding or burying evidence of the attacks so it was not reported to internal affairs or supervisors higher up the chain of command."[126]  Ryans has no evidence to support this claim.  There is no record evidence of any employee "intentionally burying or withholding evidence."  And even if there were, the claim still fails because this is nothing more than an improper attempt to hold the City liable under a respondeat superior theory of liability.  For example, in *Bryson v. City of Oklahoma*, the Tenth Circuit rejected plaintiff's theory that the City had a "custom of encouraging forensic chemists to manipulate evidence in order to obtain convictions" because the specific criticisms were limited to one chemist.[127]  The Court held this was not "sufficient to give rise to *an inference of a widespread City practice* of fabricating results

---

[124]  **Exhibit 32**, Amended Information; **Exhibit 28**, Jury Verdict; **Exhibit 11**, Transcript of Prelim Hearing, 47:15-48:3.

[125]  Dkt. #2, Compl. ¶¶ 73-74.

[126]  Dkt. #2, Compl. ¶ 75.

[127]  *Bryson v. City of Oklahoma City*, 627 F.3d 784, 790-91 (10th Cir. 2010).

and concealing evidence" and no policy or custom was shown.[128]  The same is true here.  The alleged conduct of one or two employees is not sufficient to establish a municipal policy or custom to support *Monell* liability and judgment should enter for the City on this claim as well.

3.    Ryans Cannot Establish Essential Elements of his Fifth Claim for Relief.

Ryans' Fifth Claim for Relief contends the City "did not have a policy governing when and how the department's [canines] could be used by Officers to subdue civilians."[129]  Ryans goes on to allege that this "left the determination of what force should be used with a canine up to the discretion of individual officers."[130]  This claim fails for at least four reasons.  First, the record indisputably establishes the City had written policies regarding both the use of canines and the use of force at the time of the incident.[131]  Second, Ryans cannot show that these policies were the cause of any alleged constitutional harm because the policies largely track and, in some instances, exceed the requirements of the Fourth Amendment.[132]  Third, Ryans cannot show the City was deliberately indifferent to the known or obvious consequences of not having policies governing the use of canines because it had them.[133]  Finally, even if Ryans' no-written-policy allegation is taken at face value, the claim still fails.  The United States Supreme Court has made clear the "mere exercise of discretion by an employee" does not give rise to a municipal constitutional violation because, if it did, "the result would be indistinguishable from *respondeat superior* liability."[134]  Here, Ryans alleges the consequence of the City not having policies governing canine

---

[128]  *Id.* at 791.
[129]  Dkt. #2, Compl. ¶ 90.
[130]  Dkt. #2, Compl. ¶ 91.
[131]  **Exhibit 19**, Salt Lake City Policy 300; **Exhibit 20**, Salt Lake City Policy 308.
[132]  *Id.*
[133]  *Id.*
[134]  *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (plurality opinion).

use is that the determination of when to use a canine is left "to the discretion of individual officers."[135]  This is yet another attempt to hold the City liable under a respondeat superior theory of liability.  Judgment should enter for the City on this claim as well.

## IV.    DEFENDANTS ARE ENTITLED TO ENTRY OF JUDGMENT ON RYANS' STATE CONSTITUTIONAL CLAIMS.

Ryans also cannot establish the essential elements of his State constitutional claims.  "In order to recover for violations of the Utah constitution, the plaintiff must clear two hurdles."[136] "First, the plaintiff must prove that the constitutional provision violated is 'self-executing.'"[137] "Second the plaintiff has to meet three elements: (1) a flagrant violation of his or her constitutional rights; (2) existing remedies do not redress his or her injuries; and (3) equitable relief, such as an injunction, was and is wholly inadequate to protect the plaintiff's right or redress his or her injuries."[138]  Ryans' Sixth Claim for Relief asserts claims under Article I, section 1 (inherent and inalienable rights), section 6 (right to bear arms), section 7 (due process), section 9 (cruel and unusual punishments), section 14 (unreasonable searches and seizures), and section 25 (reservation of unenumerated rights) of the Utah Constitution.[139]  Ryans' claims under Article I, sections 6 and 25 fail because they are not self-executing and all the claims fail because Ryans cannot meet his burden under the first or second elements of the three-part test.

### A.    Article I, Sections 6 and 25 are not Self-Executing.

Specifically, this Court has held Article I, section 25 is not self-executing.[140]  Similarly, no

---

[135]  Dkt. #2, Compl. ¶ 91.
[136]  *Palacios*, 2022 WL 605005, at *20.
[137]  *Id.*
[138]  *Id.*
[139]  Dkt #2, Compl. ¶¶ 96-101.
[140]  *P.J. ex rel. Jensen v. Utah*, No. 2:05CV00739 PGC, 2006 WL 1702585, at *14 (D. Utah June

state or federal court has ruled Article I, section 6 is self-executing and it does not meet the requirements of a self-executing provisions, i.e., that it be prohibitory and capable of enforcement without additional legislation as demonstrated by its frequent enforcement.[141]  To the contrary, it "is more of a 'general principle or line of policy . . . that does not supply[ ] the means for putting [it] into effect,'"[142] as demonstrated by its rare application and only in the context of determining the legitimacy of gun control policies or legislation.[143]

### B.    Ryans Cannot Show a Flagrant Violation of Constitutional Rights.

Even if all claims were self-executing, all the State constitutional claims fail because Ryans cannot meet his burden under the first element of the three-part test and show a flagrant violation of constitutional rights.  This Court has repeatedly held that "[t]he test measuring the flagrance of a state constitutional violation is the same test which determines qualified immunity under § 1983."[144]  Specifically, just like the two-part qualified immunity analysis, a plaintiff must show the defendant "violated clearly established constitutional rights of which a reasonable person would have known,"[145] i.e., a constitutional violation, and factually similar cases to demonstrate

---

16, 2006) ("Article I, § 25 is not self-executing").

[141] *Spackman ex rel. Spackman v. Bd. of Educ. of Box Elder Cnty. Sch. Dist.*, 2000 UT 87, ¶ 12, 16 P.3d 533 (identifying factors to consider when determining if a state constitutional provision is self-executing); *Jensen ex rel. Jensen v. Cunningham*, 2011 UT 17, ¶ 62, 250 P.3d 465 (same).

[142] *P.J. ex rel. Jensen*, 2006 WL 1702585, at *14 (applying the *Spackman* factors to determine and finding Article I, Section 25 not self-executing).

[143] *See, e.g.*, *Univ. of Utah v. Shurtleff*, 2006 UT 51, ¶ 20, 144 P.3d 1109 (holding Article I, section 6 and its limitation on regulation of firearms did not bear on the validity of the University of Utah's firearms policy).

[144] *Hardman v. Roosevelt City*, No. 2:18-cv-00785-DBP, 2019 WL 2578586, at *8 (D. Utah June 24, 2019); *see also, Potter v. Utah, Dep't of Human Servs.*, No. 2:16-cv-00345-DN, 2017 WL 6345884, at *5 (D. Utah Aug. 29, 2017) ("Utah courts define a flagrant violation in the same terms as a violation of clearly established statutory or constitutional rights for purposes of determining qualified immunity."); *Brown v. Larsen*, 2014 WL 3573415, at *2 (D. Utah July 21, 2014) ("To show a flagrant violation, the Court uses a test that closely parallels the federal law standard for 42 U.S.C. § 1983 claims.").

[145] *Wood v. Farmington City*, 910 F. Supp. 2d 1315, 1329 (D. Utah 2012).

the right is clearly established.  Applying this standard, a recent decision of this Court dismissed a

plaintiff's excessive force and arrest without probable cause claims under Article I, section 14

because plaintiff did not meet her burden to overcome qualified immunity under the Section 1983

analysis.[146]  The Court also dismissed her claims under Article I, sections 7 and 9 because "Utah

courts look to the Fourth Amendment and its state counterpart, Section 14 to evaluate" excessive

force and arrest without probable cause claims and plaintiff identified no case in which a Utah

court applied either of these provisions in a factually similar circumstance.[147]

 The same analysis applies here.  Ryans claim under Article I, section 14 fails because (as

set forth above) he cannot satisfy his burden under either prong of the Section 1983 qualified

immunity analysis.  His claims under the remaining state constitutional claims fail because claims

for excessive force are analyzed under the Fourth Amendment and its state counterpart, Article I,

Section 14, and Ryans can point to no case where a Utah court has applied Article I, Section 1, 6,

7, 9 or 25 in a factually similar circumstance.

### C. The State Constitutional Claims are Duplicative of Ryans' Federal Claim.

 Ryans also cannot meet his burden under the second element of the three-part test and show

existing remedies do not redress the injuries.  Utah constitutional claims must be dismissed if the

injuries alleged are adequately addressed through a § 1983 claim.[148]  For example, in *Mglej v.*

*Garfield County,* this court dismissed plaintiff's claims under Article I, sections 9 and 14 of the

---

[146] *Blackmore v. Carlson*, No. 4:21-CV-00026-DN-PK, 2024 WL 2883010, at **23-24 (D. Utah June 7, 2024).

[147] *Id.*

[148] *Cavanaugh v. Woods Cross City*, No. 1:08-CV-32-TC-BCW, 2009 WL 4981591, at *6 (D. Utah Dec. 14, 2009), *aff'd*, 625 F.3d 661 (10th Cir. 2010) (dismissing state constitutional claims because plaintiffs' injuries could be fully addressed through their 42 U.S.C. § 1983 claims); *Mglej v. Garfield Cty.*, No. 2:13-CV-713, 2014 WL 2967605, at *4 (D. Utah July 1, 2014) (same).

Utah Constitution because plaintiff claimed "exactly the same damage for the state causes of action as he did for his § 1983 claim."[149]  This, the court found, showed section 1983 provided an adequate remedy and the claims were dismissed.[150]  Again, in *Blackmore*, this Court dismissed plaintiff's excessive force claim under Article I, Section 14, because it was duplicative of her dismissed claim under Section 1983, holding courts "dismiss[ ] parallel state claims where a state claim would not provide redress beyond the § 1983 claim."[151]  Just like the plaintiffs in *Mglej* and *Blackmore*, Ryans asserts exactly the same damage for his § 1983 claims and his State constitutional claims are entirely duplicative of his federal 1983 claim.  Section 1983 provides an adequate remedy and the claims should be dismissed.

## CONCLUSION

For the reasons set forth above, Defendants respectfully request entry of judgment and dismissal of all claims.

DATED this 26th day of September, 2025.

SALT LAKE CITY CORPORATION


*/s/  Samantha J. Slark*
Attorney for Defendants

---

[149] *Mglej,* 2014 WL 2967605, at *4 ("To proceed, [plaintiff] must show that existing remedies under Title 42 U.S.C. § 1983 do not provide redress for his injuries. This he fails to do. Indeed, [plaintiff's] claims exactly the damage for the state causes of action as he does for his § 1983 claim.").

[150] *Id.*  See also, *Blackmore v. Carlson*, No. 4:21-CV-00026-DN-PK, 2024 WL 2883010, at **24-25 (dismissing state constitutional claims because they were duplicative of the federal 1983 claims).

[151] *Id.* at *24.

## CERTIFICATE OF SERVICE

I hereby certify that on this 26th day of September, 2025 a true and correct copy of the foregoing **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT** was electronically filed with the Clerk of Court, using the CM/ECF system, which sent notification to the following:

Gabriel K. White
THE LEGAL BEAGLE
2150 South 1300 East, Suite 500 - #9090
Salt Lake City, Utah 84106
gabriel.white@mylegalbeagle.com
jade.hudson@mylegalbeagle.com
*Attorney for Plaintiff*

*/s/ Heidi Christley*